**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SCOTT LYNN PINHOLSTER,
            *Petitioner-Appellee,*

            v.

ROBERT L. AYERS,* Warden, of the
California State Prison at San
Quentin,
            *Respondent-Appellant.*

No. 03-99003

D.C. No.
CV-95-06240-GLT

SCOTT LYNN PINHOLSTER,
            *Petitioner-Appellant,*

            v.

ROBERT L. AYERS, Warden, of the
California State Prison at San
Quentin,
            *Respondent-Appellee.*

No. 03-99008

D.C. No.
CV-95-06240-GLT

OPINION

Appeal from the United States District Court
for the Central District of California
Gary L. Taylor, District Judge, Presiding

Argued and Submitted
April 11, 2007—Seattle, Washington

Filed May 2, 2008

*Pursuant to Fed. R. App. P. 43(c)(2), Robert L. Ayers, the current cus-
todian, is substituted for Jeanne S. Woodford as Warden of the California
State Prison at San Quentin.

Before: Alex Kozinski, Chief Judge, Raymond C. Fisher and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman;
Concurrence by Chief Judge Kozinski;
Dissent by Judge Fisher

## COUNSEL

Kristofer Jorstad, Deputy Attorney General, Los Angeles, California, for the respondent-appellant, cross-appellee.

Sean K. Kennedy, Federal Public Defender, Los Angeles, California, for the petitioner-cross appellant/appellee.

## OPINION

TALLMAN, Circuit Judge:

Scott Lynn Pinholster faces a death sentence in California for murdering Thomas Johnson and Robert Beckett on January 9, 1982, robbing Johnson and Beckett with intentional infliction of great bodily injury and with personal use of a knife, robbing Todd Croutch with a firearm, and burglarizing Michael Kumar's residence. The jury found two special circumstances: Pinholster, in the same proceeding, was convicted of more than one murder, Cal. Penal Code § 190.2(a)(3) (1984), and he committed the murders during a robbery and a burglary, *id.* § 190.2(a)(17)(i), (vii). The jury fixed Pinholster's penalty at death, and on June 4, 1984, the Los Angeles County Superior Court so sentenced him.

On automatic appeal, the California Supreme Court, in an opinion written by Justice Stanley Mosk, set aside one multiple-murder special-circumstance finding but otherwise affirmed the judgment. *See People v. Pinholster*, 824 P.2d 571 (Cal. 1992). Pinholster sought a writ of habeas corpus. He challenged his convictions and death sentence. The California Supreme Court summarily denied Pinholster's state petition for habeas corpus. Pinholster filed a federal habeas corpus petition but the district court dismissed it when the parties stipulated that the petition contained unexhausted claims. Pinholster returned to state court to exhaust those claims. On October 1, 1997, the California Supreme Court denied Pinholster's second habeas petition.

Pinholster then filed an amended federal habeas petition and requested an evidentiary hearing on several claims. The district court granted the State's motion for summary judgment on Pinholster's claims challenging the constitutionality of his convictions. Pinholster appeals the district court's denial of his request for an evidentiary hearing on his guilt phase ineffective assistance of counsel claims. However, the

district court concluded that his counsel inadequately investigated and deficiently presented mitigating evidence at the penalty phase and granted Pinholster's habeas petition with respect to the death penalty. The State cross-appeals the district court's judgment setting aside Pinholster's death sentence.

We affirm the district court's denial of an evidentiary hearing on Pinholster's claims of ineffective assistance during the guilt phase. We reverse the district court's grant of habeas relief on Pinholster's death sentence.

I

A

On January 9, 1982, Pinholster fatally stabbed the victims, Johnson and Beckett, during Pinholster's burglary of Kumar's residence.[1] *Pinholster*, 824 P.2d at 582. Kumar was a known drug dealer and acquaintance of Pinholster. Charles Kempf, another acquaintance of Pinholster, testified that in mid-December 1981, Pinholster suggested to Kempf and three others that they rob Kumar of his drug stash.[2] *Id.* According to Kempf, Pinholster considered Kumar "an easy mark." *Id.* The five went to Kumar's home, but soon aborted the plan. Kumar was not home during the December visit, and they preferred to gain access through Kumar rather than break in. *Id.* Kempf testified that Pinholster carried a buck knife, and Pinholster claimed he would get Kumar's drugs "one way or the other." In addition, Kempf testified that Pinholster bragged about

---

[1]We extract many of the facts and procedural history from the California Supreme Court opinion affirming Pinholster's convictions and death sentence on direct appeal, *Pinholster*, 824 P.2d 571, which are confirmed by our own independent review of the record.

[2]Kempf had a previous conviction for receiving stolen property and was under arrest when he first talked with the police. He told the jury that the authorities did not promise leniency or other benefits in return for his testimony. *Pinholster*, 824 P.2d at 582.

having stabbed someone in the rectum during a previous rob-bery. *Id.*

Art Corona—an accomplice in the crimes—served as the State's primary witness. He testified that on January 8, 1982, he attended a social gathering at Pinholster's apartment com-plex. *Id.* Corona agreed to help Pinholster and co-defendant Brown rob Kumar. *Id.* En route, Corona drove the two in his car and stopped at Lisa Tapar's residence. *Id.* Pinholster wanted Tapar to help them gain access to Kumar's residence. *Id.* After Tapar refused to allow Pinholster into her apartment, he used his buck knife to vandalize the door of her apartment and the hood of her car. *Id.* Tapar, her father, and another wit-ness corroborated Corona's version of this incident. The group then left Tapar's apartment to burglarize Kumar's resi-dence.

Corona testified about the events that took place during the burglary. Pinholster gained entry by breaking a window in the rear of the home and Brown entered through an open sliding-glass door. *Id.* at 582-83. The three ransacked the house. *Id.* at 583. Pinholster found marijuana in a bedroom and spilled a green substance in the kitchen. *Id.* At this time, victims Johnson and Beckett (Kumar's housesitters) arrived, opened the front door, discovered the crime, and shouted they would call the police. The three burglars attempted to leave through the rear sliding-glass door, but Johnson and Beckett came around to the back. As Johnson tried to enter, Pinholster stabbed Johnson in the chest three to four times with the knife. The California Supreme Court summarized Corona's description of the robbery, stabbing, and murders as follows:

> [Pinholster] backed [Johnson] out of the house and onto the patio, demanding drugs and money and repeatedly striking him. Johnson dropped his wallet on the ground and obeyed [Pinholster's] order to sit. Then Beckett approached, and [Pinholster] attacked him. Corona saw that [Pinholster] was stabbing

Beckett, striking him in the chest as Corona had seen [Pinholster] strike Johnson. [Pinholster] repeatedly stabbed Beckett, again demanding money and drugs. [Pinholster] picked up Johnson's wallet and took a wallet from Beckett's pocket. [Pinholster] repeatedly kicked Beckett in the head. Corona then saw codefendant Brown stabbing Johnson in the chest. The three men withdrew, and Corona drove them back to [Pinholster's] apartment. Brown and [Pinholster] commented that they had "gotten them good," and Brown said he had "buried his knife to the hilt" in Johnson.

*Id.*

After the murders, the three returned to Pinholster's apartment and split the proceeds. Pinholster washed his knife and a woman named Debbie washed Brown's knife. *Id.* The next day, Pinholster telephoned Corona and told him to "lie low." Two weeks later, Corona turned himself in and gave a statement to the police. Corona testified at trial consistent with his earlier statement except that at trial he also mentioned seeing Brown stab Johnson and that he, Brown, and Pinholster divided the proceeds. *Id.*

Casey Corona, Art Corona's wife, was at Pinholster's apartment when Pinholster, Brown, and Art Corona returned from Kumar's house. At trial, Casey corroborated Corona's testimony about the planning, execution, and cover up of the robbery/murders. She testified that she saw Pinholster wash blood off his knife and she heard him say: "It had to be done the way it was done. We had to do what we had to do." *Id.* Police had recently arrested Casey on a drug charge, and she testified that the prosecution assisted her entry into a diversion program.

Art Corona also testified that Pinholster had threatened him on numerous occasions. Specifically, prior to the preliminary

hearing, Pinholster threatened to "blow up" Corona on his way to court if Corona testified against him. Pinholster impeached Corona with Corona's prior burglary conviction and Corona's admission that he was a professional burglar. *Id.*

The State introduced physical evidence to corroborate Pinholster's presence in Kumar's residence after it had been ransacked. Corona testified that Pinholster wore jeans and boots on the night of the murders. Police found boots with microscopic blood stains and a towel with a blood stain in Pinholster's apartment. Police also found a pair of jeans with a blood stain; however, investigators could not confirm whether the blood was human. In addition, when police arrested Brown, he had a buck knife with dimensions that corresponded to one of Johnson's stab wounds. *Id.* at 583-84. Investigators also discovered traces of human blood near the hilt of Brown's knife. The police found human blood on the inside forearm of the sleeve of Corona's shirt, but they found no blood on his knife. *Id.* at 584.

Pinholster presented an alibi when he testified in his own defense at trial. He characterized himself as a "professional robber" who used guns while preying on drug dealers, not a murderer who used knives. He boasted of being a "very good robber," claiming that he had committed "hundreds" of robberies and that he had only been caught by the authorities one time. To support his defense, Pinholster admitted to robbing Thomas Croutch at gunpoint on another occasion, and having planned to rob Kumar, but denied having recruited Kempf and the three other individuals to do so. Pinholster also admitted to breaking into Kumar's house on the night of the murders.

By way of his alibi, Pinholster claimed he had thrown a party in memory of his best friend, "Shotgun," on the night of the murders. *Id.* He testified that around 8 p.m. he left the party and went to Kumar's house, broke a window, and gained access through the kitchen. He took a bag of marijuana, touched a bluish substance in a bedroom, and spilled a

bag with green material in the kitchen. He denied ransacking the house or killing anyone.[3] *Id.* Pinholster said he had returned to his house around 9 p.m., and smoked a considerable amount of marijuana and consumed a lot of alcohol. Around 11:30 p.m., Corona asked Pinholster for an ounce of marijuana to sell. Pinholster said he gave Kumar's address to Corona in exchange for a third of whatever drugs Corona took from Kumar's house. Corona could not find Kumar's residence and returned around 1 a.m. Pinholster gave him the directions again, and around 1:30 a.m. Pinholster went to Tapar's house to tell her that "Shotgun" had died.[4] *Id.* at 585. He admitted to stabbing her door and carving a swastika and lightning bolt on her car after she refused to admit him. Pinholster claimed that he returned to his apartment around 2 a.m., and Corona returned around 4 a.m. Pinholster's brother and several friends corroborated his version of the events. The superior court jury by its verdict obviously rejected Pinholster's alibi defense.

B

The State sought the death penalty. On March 22, 1983, the prosecution mailed a California Penal Code section 190.3 letter to Pinholster at the Los Angeles County Jail, notifying him that the State intended to offer aggravating evidence at the penalty proceedings. Pinholster and his counsel[5] contended

---

[3]During rebuttal, the state called Eric Klemetti who testified that he had purchased marijuana from Johnson at the Kumar residence at 9 p.m. He claimed that the house was not ransacked and everything was in order. *Pinholster*, 824 P.2d at 585.

[4]On rebuttal, Tapar contradicted Pinholster when she testified that Pinholster arrived at her house in Corona's car, not his own as he had said. She also claimed not to have known "Shotgun," giving Pinholster no reason to discuss his death with her.

[5]Between April 20, 1982, and January 19, 1983, court-appointed counsel Marvin Part represented Pinholster. Attorney James Armstrong was appointed in his place in January 1983. Pinholster requested to proceed

they were not informed of the letter until the guilt phase concluded on April 24, 1984. Pinholster moved to exclude aggravating evidence based on the prosecution's failure to comply with California Penal Code section 190.3. The court denied the motion.[6] Rather than move to continue the penalty phase —a request the state trial court indicated it would grant— Pinholster's counsel (Brainard and Dettmar) elected to proceed. The penalty phase began on May 1, 1984. The court instructed the jury on May 2, 1984, and the jury returned a verdict of death on each of the two murder counts on May 7, 1984.

The prosecution called eight penalty phase witnesses. First, Jack Taube, Pinholster's juvenile probation officer, testified that Pinholster had previously struck a bailiff without cause after a court proceeding. Several bailiffs had to physically restrain Pinholster, and, as Pinholster left the proceeding, he continued to orally threaten the wounded bailiff. Taube also testified about Pinholster's involvement in juvenile gangs. Second, Los Angeles Police Department ("LAPD") patrol officer David Kaufman testified that shortly after he and his partner responded to a fight involving Pinholster, Pinholster appeared to fake an epileptic seizure. Officer Kaufman also testified that once handcuffed, Pinholster became belligerent and threatened to kick the officers. After the officers transferred Pinholster to a facility for possible medical treatment,

without counsel, and from March 17, 1983, to July 13, 1983, Pinholster represented himself. On July 12, 1983, the Los Angeles County Superior Court appointed Harry W. Brainard after Pinholster changed his mind. On December 20, 1983, the superior court also appointed Wilbur G. Dettmar as second counsel under California Penal Code section 1095. Brainard and Dettmar represented Pinholster during the guilt and penalty phases of his trial.

[6]On state habeas review, the Los Angeles County Superior Court held an evidentiary hearing and determined that Pinholster, while representing himself pre-trial, received actual notice of the State's intent to seek the death penalty. Pinholster does not challenge that finding here.

and upon removing Pinholster's leg restraints, Pinholster kicked Officer Kaufman in the head.

Third, Ernest Guzman, another LAPD officer, testified that after refusing to enter his police vehicle on a different occasion, Pinholster seemingly faked an epileptic seizure. After the officers placed Pinholster in the police car he became violent, kicking at Officer Guzman's head. After Pinholster told the officers that he had a knee injury, they transported him to Valley Receiving Hospital for an evaluation. During that time, Pinholster spat in Guzman's partner's face, and refused to allow doctors to examine his knee. Pinholster kicked and broke one of the glass panes in the x-ray machine. Fourth, Deputy Sheriff Michael Loper testified to having "numerous run-ins" with Pinholster in a Los Angeles County Jail. Pinholster struck Loper as he assisted another deputy in gaining control over Pinholster, who had refused to comply with jail rules.

Fifth, Operations Sergeant Thomas Piggott testified about Pinholster's violent reputation and disciplinary record at the Los Angeles County Central Jail. He described eleven documented incidents of Pinholster's violence or recalcitrance and stated that Pinholster had a reputation of throwing cups of urine at the deputies as they walked by his cell. Piggott also testified that he tried to counsel Pinholster, but Pinholster insisted that he wanted to go to prison. Piggott recalled Pinholster saying, "They better send me now, because if they don't I'll just go out on the streets and do something to get back in, go to prison."

Sixth, Theodore Mesquita testified about fighting with Pinholster over a woman Mesquita dated, which resulted in Pinholster cutting Mesquita's arm with a straight razor, requiring approximately fifty stitches. Pinholster's wife, Cathy Ann Smith, testified that Pinholster once broke her jaw while seeming to have an epileptic seizure. Finally, Sheriff's Ser-

geant Joseph Barrett testified that Pinholster told Barrett he would kill Art Corona when released from prison.

In addition, to minimize the inconvenience of gathering witnesses from San Luis Obispo, Pinholster's counsel stipulated that (1) Pinholster's prior kidnaping conviction involved a knife, but that no plea bargain governed the knife use allegation (Pinholster admitted to carrying the knife and placing it at the victim's throat), and (2) Pinholster committed numerous prison disciplinary infractions, including throwing urine at and threatening various corrections officers. Counsel stipulated that Pinholster threatened to stab a corrections officer and to throw another corrections officer off of the prison tier. Pinholster's disciplinary infractions resulted in the Director of Corrections ordering Pinholster to be placed on a special disciplinary diet for a nine-day period in 1979, a procedure reserved for only the most disruptive inmates.

Pinholster's counsel, Dettmar, waived making an opening statement in the penalty phase of his trial and immediately called Pinholster's mother, Burnice Brashear. She testified about Pinholster's strained relationship with his step-father, Bud Brashear; Pinholster's head injury at age two and one-half years when she ran over him with her car; his head injury shortly thereafter when his head cracked the windshield during a car accident; his disruptive behavior at school; a psychologist's recommendation that Pinholster be committed to a mental hospital when he was ten; his time in a class for the emotionally handicapped; his view of himself as a neighborhood Robin Hood because he stole things to distribute to the neighborhood children; his frequent stays at boys' homes, juvenile halls, and juvenile camps; and his epilepsy, which she believed resulted from a severe beating at age eighteen in county jail.

## C

Following Pinholster's unsuccessful direct appeal, he initiated habeas proceedings in state and federal court. We detail

his submissions with regard to his penalty phase ineffective assistance of counsel claim because the State contends that, by the time of the federal evidentiary hearing, this claim had transmogrified into a completely new theory for which Pinholster now relies on yet a third set of mental health experts.

1

Pinholster raised fifty claims for relief in his state habeas petition. Relevant to this appeal, Pinholster claims his counsel provided ineffective assistance at the guilt and penalty phases of his trial. Regarding his death sentence, he argues that his trial counsel unreasonably failed to investigate, prepare, and present mitigating evidence, and unreasonably presented evidence that hurt his mitigation case. Had his counsel investigated mitigating evidence, he contends, his lawyers would have uncovered a wealth of mitigating evidence—a turbulent, dysfunctional, violent and abusive home life; serious, well-documented educational disabilities; and profound mental disorders. To support this claim, Pinholster submitted declarations from family members and from his trial attorney, Brainard; various medical, legal, and school records of Pinholster and his relatives; and a declaration obtained during habeas proceedings from psychiatrist Dr. George Woods.

Dr. Woods diagnosed Pinholster with a long standing bipolar mood disorder with psychotic features. Dr. Woods opined that, during the murders, Pinholster was substantially impaired by a bipolar mood disorder operating synergistically with a seizure disorder.[7] Dr. Woods also criticized Dr. John Stalberg's psychiatric evaluation. Dr. Stalberg had previously examined Pinholster at defense counsel's request on March 11, 1984, after trial began. He reviewed case materials supplied by counsel, including police reports and a probation report. Dr. Stalberg concluded that Pinholster did not manifest

---

[7]"Seizure disorder" is the medically preferred term for what is commonly known as epilepsy.

by history any significant signs of mental disorder or defect other than Antisocial Personality Disorder.[8] Dr. Stalberg stated he saw no mitigating evidence, and defense counsel decided not to pursue this issue at the time. Habeas counsel disavowed Dr. Stalberg as a credible expert after retaining Dr. Woods to criticize Dr. Stalberg's mid-trial evaluation of Pinholster.

After the parties filed briefing in the state habeas case, the California Supreme Court issued an order to show cause, but subsequently vacated it as "improvidently granted." The court then denied the writ "on the substantive ground that it is without merit." The California Supreme Court also denied several other claims on procedural grounds.

2

In Pinholster's first federal habeas petition, he continued to maintain that his trial counsel unreasonably failed to investigate, prepare, and present mitigating evidence during the penalty phase. This time, however, Pinholster switched tactics and renamed Dr. Stalberg as his psychiatric expert. In April 1997, Pinholster's habeas counsel asked Dr. Stalberg to review additional materials pertaining to Pinholster and his family. Dr. Stalberg reviewed the materials and spoke with several of Pinholster's family members. Dr. Stalberg then concluded that knowledge of Pinholster's family history of

---

[8]The Diagnostic and Statistical Manual of Mental Disorders (DSM), DSM-III, the American Psychiatric Association's handbook in effect in 1984 for diagnosing mental disorders, describes Antisocial Personality Disorder as a personality disorder with a history of continuous and chronic antisocial behavior in which the rights of others are violated, persistence into adult life of a pattern of antisocial behavior that began before the age of 15, and failure to sustain good job performance over a period of several years. Lying, stealing, fighting, truancy, and resisting authority are typically prevalent in early childhood, and in adulthood these kinds of behavior continue and include the failure to accept social norms with respect to lawful behavior.

severe psychiatric disorders, Pinholster's disturbed behavior during childhood, and his irrational and highly aggressive actions immediately before the homicides would have caused him to inquire further before concluding that Pinholster merely had a personality disorder. Dr. Stalberg also would have inquired further to determine if the homicides related to a mental impairment caused by organic/neurological dysfunction. Dr. Stalberg now declared that the new information he reviewed would have materially modified his previous opinion regarding mitigating circumstances, and that his review now demonstrated the existence of voluminous mitigating evidence.

Because the declaration contained new material facts, the parties stipulated that certain claims, including the penalty phase ineffective assistance of counsel claim, were unexhausted. The district court allowed Pinholster to exhaust the claims in state court.

### 3

Pinholster filed a copy of his federal petition and Dr. Stalberg's new declaration in the California Supreme Court. The court denied Pinholster's petition "on the substantive ground that it was without merit" and denied other claims on procedural grounds.

### 4

Pinholster filed a "First Amended Petition for Writ of Habeas Corpus" in federal court on November 14, 1997. On April 13, 1999, Pinholster filed a request for a federal evidentiary hearing. Applying pre-Antiterrorism and Effective Death Penalty Act ("AEDPA") standards, the district court granted an evidentiary hearing on Pinholster's penalty phase ineffec-

tive assistance of counsel claim, and two other claims not relevant to this appeal.[9]

Dr. Stalberg anticipated testifying as a witness at the federal evidentiary hearing. Pinholster submitted two new declarations from Dr. Stalberg to support his amended federal habeas petition. The first, dated January 24, 2000, explained that it was Dr. Stalberg's custom and practice in 1984 when retained by defense counsel in a capital case to form an opinion about a defendant's mental state during the offense and to identify mitigating circumstances. The second, dated June 5, 2001, expanded upon and specified the factual bases for the opinions Dr. Stalberg previously presented to the district court. In July 2001, the State Attorney General's Office deposed Dr. Stalberg. The Deputy Attorney General questioned Dr. Stalberg about his earlier declarations, and Pinholster's counsel asked Dr. Stalberg to elaborate on various aspects of his opinions, and to express his opinions about Pinholster's mental health.

Dr. Stalberg testified that the additional materials he reviewed did not alter his conclusion that Pinholster suffers from Antisocial Personality Disorder. As a result of this damaging testimony, on May 9, 2002, Pinholster's current counsel, the Federal Public Defender, advised Dr. Stalberg that he would no longer call him as a witness during the evidentiary hearing, and he no longer considered Dr. Stalberg to be Pinholster's expert.

The district court nonetheless proceeded with an evidentiary hearing in September 2002. The Federal Public Defender's Office now utilized two new experts—Dr. Sophia Vinogradov and Dr. Donald Olson—to bolster Pinholster's

---

[9]At this time, the district court also granted the State's motion for summary judgment on select claims, including Pinholster's claims of ineffective assistance of counsel at the guilt phase discussed in section III of this opinion.

penalty phase ineffective assistance of counsel claim. Dr. Vinogradov and Dr. Olson both submitted declarations as direct testimony at the evidentiary hearing. Dr. Vinogradov concluded that Pinholster suffered "personality change, aggressive type, due to serious childhood head trauma." Dr. Olson, a pediatric neurologist, testified that Pinholster likely suffered brain damage from two head injuries in his early childhood, which created a risk of epilepsy.

On March 25, 2003, the district court granted Pinholster's habeas petition and vacated his death sentence. The district court noted that Pinholster's attorneys admitted they had not "prepared any evidence by way of mitigation," yet trial counsel declined an offer for a penalty phase continuance to prepare extenuating evidence. The district court further reasoned that trial counsel called one witness—Pinholster's mother—and her testimony was damaging, incomplete, and inaccurate. The district court found Pinholster's attorneys' performance deficient because they failed to adequately investigate mitigating evidence and lacked a reasonable strategic decision for their failure. The district court ultimately found prejudice based on the significant evidence of Pinholster's childhood abuse and mental impairments, combined with the prosecutor's emphasis during summation on the lack of mitigating evidence and the length of the jury's deliberations.

The district court revisited its March 25, 2003, Order Granting Writ of Habeas Corpus, after determining that AEDPA applied under *Woodford v. Garceau*, 538 U.S. 202 (2003). The Supreme Court filed *Woodford* on the same day the district court had filed its Order. The district court nonetheless concluded that: (1) Pinholster timely filed his federal habeas petition; (2) Pinholster was entitled to an evidentiary hearing under AEDPA; and (3) AEDPA did not affect its Order granting Pinholster habeas relief because the California Supreme Court "did not adjudicate Pinholster's claim that counsel was ineffective for failing to investigate and present mitigating evidence at the penalty phase."

## II

We review de novo the district court's decision to grant or deny a petition for writ of habeas corpus. *Lambert v. Blodgett*, 393 F.3d 943, 964 (9th Cir. 2004). We review factual findings and credibility findings made in the context of granting or denying the petition for clear error. *Id.*

Neither party disputes that AEDPA now governs Pinholster's petition. AEDPA requires us to defer to the state court's determination of federal issues, unless that determination resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1).[10] Deference to state court decisions applies only to claims the state court adjudicated on the merits.[11] *Lambert*, 393 F.3d at 965. De novo review applies if the state court did not reach

---

[10]The court may also grant a petition where the state court adjudication of a claim is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2). We will address § 2254(d)(2) only when applicable to Pinholster's appeal.

[11]The district court incorrectly concluded that the California Supreme Court's decision disposing of Pinholster's penalty phase ineffective assistance of counsel claim was not an adjudication on the merits entitled to deference. The California Supreme Court's denial of a habeas petition without comment or citation constitutes a decision on the merits of the federal claims. *See Hunter v. Aispuro*, 982 F.2d 344, 347-48 (9th Cir. 1992); *see also Gaston v. Palmer*, 417 F.3d 1030, 1038 (9th Cir. 2005). Though we would ordinarily look through the California Supreme Court's summary denial to the "last reasoned decision [in the state court system]," *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000), no other state court determination addresses ineffective assistance of counsel at the penalty phase. Absent a last-reasoned state court decision on this claim, we must "perform an 'independent review of the record' to ascertain whether the state court decision was objectively unreasonable." *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003) (quoting *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000)); *see also Greene v. Lambert*, 288 F.3d 1081, 1089 (9th Cir. 2002).

the merits of a particular issue. *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004).

A decision is "contrary to" federal law when the state court applies a rule of law that contradicts the governing law set forth in Supreme Court precedent or when the state court makes a determination contrary to a Supreme Court decision on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court unreasonably applies federal law when its application of Supreme Court precedent to the facts of petitioner's case is objectively unreasonable. *Id.* at 409.

## III

We first address Pinholster's appeal of the district court's grant of summary judgment in favor of the State on his claims of ineffective assistance of counsel during the guilt phase of his trial. Pinholster seeks an evidentiary hearing, arguing that he has provided a colorable claim that his counsel performed deficiently. His primary contention is that his counsel failed to adequately investigate the State's physical evidence placing him at the scene during the murders and this resulted in an uninformed decision to have Pinholster testify in his own defense. *See United States v. Curtis*, 742 F.2d 1070, 1076 (7th Cir. 1984) (per curiam) ("When a defendant asserts that he desires to exercise his constitutional right to testify truthfully, counsel's duty is to inform the defendant why he believes this course will be unwise or dangerous.").

At the time the California Supreme Court rendered its last decision—October 1, 1997—the Supreme Court's two-part standard for analyzing ineffective assistance of counsel was clearly established law. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish a Sixth Amendment violation, Pinholster had to show that: (1) his counsel's performance was deficient, i.e., it fell below an objective standard of reasonableness, and (2) the deficient performance preju-

diced him. *Id*. In reviewing counsel's performance, we "must be highly deferential" and should make every effort "to eliminate the distorting effects of hindsight." *Id.* at 689. Even if we conclude that counsel performed deficiently, to obtain relief the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

A

**[1]** To satisfy the first prong of *Strickland*, Pinholster must "identify[ ] the acts or omissions 'that are alleged not to have been the result of reasonable professional judgment.' " *Earp v. Ornoski*, 431 F.3d 1158, 1173-74 (9th Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The State offered during its case-in-chief the following pieces of physical evidence to corroborate Corona's testimony and place Pinholster at the scene of the crime at the time of the murders: (1) investigators found dried blood on the bottom of the boots taken from Pinholster's closet and the sole print matched a bloody boot print near the victims' bodies; and (2) investigators found a palm print matching Pinholster's print located within the Kumar residence.[12] Pinholster contends that trial counsel's failure to investigate this evidence constituted deficient performance, leading to an ill-advised decision to have Pinholster testify in his own defense, during which he admitted to several incriminating facts.

---

[12]Pinholster requests that we take judicial notice of the following documents to support his assertion that the State unlawfully destroyed all of the physical evidence after trial: (1) an excerpt of the Master Index with a list of the State's physical evidence; (2) a certificate from the Los Angeles County Superior Court ordering the exhibits listed on the "non-valuable exhibit" list destroyed; and (3) the "non-valuable exhibit" list. We deny his request as these documents are not relevant to the resolution of this appeal. *See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006).

1

Assuming trial counsel's failure to investigate the physical evidence fell below the objective standard of reasonableness, we nevertheless conclude that the district court properly granted the State's motion for summary judgment because Pinholster failed to raise a colorable claim that the deficient performance prejudiced him. *See Strickland*, 466 U.S. at 697 (stating that a court may presume ineffective assistance to dispose of a claim on prejudice grounds).

At the homicide scene, the police detectives discovered boot prints left in blood near the victims' bodies. When executing the search warrant for Pinholster's apartment, homicide detectives found a pair of black boots that appeared to have tread marks that were similar to the prints left at the scene. Testing revealed microscopic stains on the boots that gave positive reactions for blood. Specifically, investigators detected blood in all of the crevices of the right boot. Criminalist Steven Schliebe also testified that the treads on the boots taken from Pinholster's apartment were consistent with the treads that left the boot prints at the crime scene.

During cross-examination of Detective Coffey—the detective who discovered the boots in Pinholster's apartment—Pinholster's counsel asked whether the boots had a common tread. The detective responded, "I'm not a boot expert, but I had not seen this type of tread on boots. I have seen other types of tread. Not to say it's not common or uncommon. To me, I have not seen that type of tread before." In his habeas petition, however, Pinholster offered a declaration from Criminalist Schliebe that stated otherwise: Schliebe declared that, "had he been asked if the sole pattern [of Pinholster's boots and the boot prints found at the crime scene were] common in the Southern California area," he would have answered, "the shoe sole pattern is fairly common and is frequently found on work and sport boots."

The district court denied Pinholster's claim of ineffective assistance of counsel for lack of prejudice. It reasoned that "the boot that was found in [Pinholster's] home had a trace of blood on it[,] which distinguishes it from other boots with the same tread." The district court also denied Pinholster's claim that trial counsel were ineffective for eliciting Detective Coffey's opinion that the boot print was uncommon. It reasoned that Detective Coffey "never testified that the boot print was uncommon"; rather, he "stated that he had not seen the sole pattern before" and "clarified that he was not a boot print expert."

The second piece of physical evidence was a palm print lifted from a closet door frame in the Kumar residence that matched a palm print later taken from Pinholster. During direct examination, the fingerprint expert testified that he conducted two prior identification attempts before he was able to conclusively determine that the print lifted from the door matched Pinholster's. The expert explained that the palm print lifted from the closet door came from the far outside portion of the left palm. In the two prior attempts, the lab used exemplar cards that excluded the outside portion of the palm. Normally, when a person is palm printed, the palm is laid flat on the exemplar card. Therefore, as the expert testified, "it was not until [Detective] Coffey provided [his] office with this exemplar card with the palm prints, and also a roll of the far left-hand side, that [he was] able to find the area that matched up with the print that [he] lifted from the door frame."

Pinholster argues that his trial counsel were ineffective for failing to independently test the palm print. In support of his argument, Pinholster offered a declaration of an independent fingerprint expert, Clarence Collins. After examining both the lifted print and the rolled palm print taken from Pinholster, Collins concluded that the prints "were not made by the same person." In addition, Pinholster offers a declaration taken from Brainard stating that, "[h]ad I known Scott Pinholster did not deposit the latent print found at the Kumar residence,

I would have conducted the defense differently, and would have appropriately changed my advice to my client. I probably would have advised Scott Pinholster not to testify during [the] guilt phase."

The district court denied Pinholster's request for an evidentiary hearing on the basis that he again failed to show prejudice. First, Pinholster admitted that he was inside Kumar's residence on the night of the murders. Second, Pinholster's trial counsel merely stated that he *probably* would have advised Pinholster not to testify.[13] This does not necessarily show that Pinholster's admission would not otherwise have been made. The record is quite clear that Pinholster was eager to take the stand so he could convince the jury that, although he saw himself as a professional thief who preyed on drug dealers, his modus operandi was to carry a gun, not to stab his victims with knives.

[2] We agree with the district court and hold that Pinholster failed to show a colorable claim that he was prejudiced by trial counsel's alleged failure to independently investigate the State's physical evidence. Despite Pinholster's contention, Collins's declaration does not prove that the State's fingerprint expert was lying or misinformed. At most, it creates a battle of the experts.[14] Moreover, the jury heard the State's

---

[13]We are not holding, nor do we think the district court found, that Pinholster's counsel's statement that he "probably" would not have advised Pinholster to testify is sufficient to establish that counsel's failure to investigate was non-prejudicial. *See* Dissent Op. at 4785 n.2. Indeed, Pinholster uses counsel's declaration to argue that he *was* prejudiced. Pinholster argues that had his trial counsel investigated the palm print he would have known there was a discrepancy and therefore never would have advised Pinholster to testify. Pinholster argues that without his testimony there was no evidence that he was in Kumar's residence at the time of the murders and therefore counsel's failure to investigate *was* prejudicial. As we discuss *infra* these arguments are simply unpersuasive as there was a wealth of other evidence proving Pinholster's presence in the Kumar residence.

[14]Contrary to the dissent's assertion, we are not saying that the existence of a "battle of the experts" reduces any prejudice resulting from counsel's

fingerprint expert testify that he could not match Pinholster's print until the third attempt. Although Pinholster argues that the "State's expert was pressured to find a match," no evidence supports such a contention. In addition, the State presented the palm print evidence to place Pinholster in the Kumar residence at the time of the murders. This evidence was cumulative as Corona testified that Pinholster was in the Kumar residence at the time of the murders, and substantial portions of Corona's testimony were corroborated by Lisa Tapar, her father, and Casey Corona. Pinholster's admission to the jury that he was inside Kumar's house at some point that night further convinces us that the alleged ineffectiveness did not prejudice him. Therefore, we hold that the jury's verdict would not have been affected even if Pinholster's trial counsel had conducted an independent investigation and introduced evidence that the palm print was not Pinholster's.

[3] Pinholster also failed to show a colorable claim that he was prejudiced by trial counsel's failure to investigate the boot prints. The State did not argue that this evidence connected Pinholster to the crime because the sole prints were unique; rather, the state argued that this evidence connected Pinholster to the crime scene because (1) the sole prints were consistent, *and* (2) Pinholster's boots were found to have traces of human blood on the bottom. Therefore, even if the jury heard evidence that the sole prints were common in Southern California, this would not have changed the verdict. Pinholster offers no other evidence to suggest that the boot print evidence was faulty.

2

Because we conclude that Pinholster failed to raise a colorable claim that he was prejudiced by trial counsel's failure to

---

failure to investigate the palm print. *See* Dissent at 4785 n.2. We are simply saying that Collins's declaration creates only a battle of the experts; it does not prove Pinholster's contention that the State's expert was misinformed, improperly influenced, or lying.

investigate the State's physical evidence, we cannot conclude that trial counsel's decision to advise Pinholster to testify in his own defense amounted to ineffective assistance. The dissent is ensnared in the trap of 20/20 hindsight. It fails to give a sufficient level of deference to counsel's judgments given the evidence and the type of defense Pinholster wanted to pursue. *See Rompilla v. Beard*, 545 U.S. 374, 381 (2005) ("In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to counsel's perspective at the time investigative decisions are made and by giving a heavy measure of deference to counsel's judgments." (internal quotation marks and citation omitted)).

"An accused's right to testify is a constitutional right of fundamental dimension." *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993). When reviewing ineffective assistance of counsel claims that question the attorney's trial strategy, it is important to "note that a defendant's Sixth Amendment rights are his alone, and that trial counsel, while held to a standard of 'reasonable effectiveness,' is still only an *assistant* to the defendant and not the master of the defense." *Mulligan v. Kemp*, 771 F.2d 1436, 1441 (11th Cir. 1985). The reasonableness of counsel's chosen trial strategy depends critically "on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland*, 466 U.S. at 691. The record amply demonstrates that this strategic tactical decision was deliberate and considered. Pinholster actively participated in all key decisions, as he represented himself pro se at one point before the trial, and strongly directed the strategy he wished counsel to pursue.

The record shows that Pinholster directed his trial counsel to pursue an alibi defense on his behalf. On June 24, 1983, the trial court held a hearing on a motion to dismiss filed by Pinholster while representing himself. Pinholster argued that his first appointed trial counsel, Marvin Part, coerced him into waiving his right to a speedy trial. During the hearing, Pinhol-

ster called Part to testify, waiving his attorney-client privilege. Pinholster questioned why Part refused to interview possible alibi witnesses in the face of physical evidence linking Pinholster to the crime scene. Pinholster's insistent decision to pursue an alibi defense necessarily impacted his counsel's trial strategy.[15]

Even without the physical evidence, the State presented overwhelming evidence that Pinholster was at the Kumar residence on the day of the murders. Corona's testimony not only placed Pinholster at the scene during the murders, but it also detailed Pinholster's participation in the murders. Several other witnesses corroborated Corona's testimony.

[4] In light of the evidence placing Pinholster at the scene, Pinholster's failure to show prejudice from his trial counsel's failure to investigate the physical evidence, and Pinholster's strong desire to pursue an alibi defense, we cannot second guess trial counsel's decision to advise Pinholster to testify.[16] In *Strickland*, the Court recognized that "[c]ounsel's actions are usually based . . . on informed strategic choices made by the defendant and on information supplied by the defendant." 466 U.S. at 691. To support Pinholster's alibi defense, trial counsel needed to explain the overwhelming evidence prov-

---

[15]Brainard declared:

> The strategy decided upon prior to trial was to demonstrate Scott committed robberies and not burglaries, and that Scott used guns, not knives, as weapons. I assumed Scott would admit to having committed a few robberies, not hundreds, although we never explicitly discussed the number. Part of [the] strategy decided upon prior to trial was to admit the Croutch robbery during trial.

[16]The dissent assumes that trial counsel never advised "Pinholster against testifying, because the jury would likely conclude he was lying." *See* Dissent at 4786. There is a dearth of evidence in the record detailing any discussion between trial counsel and Pinholster about his decision to testify during the guilt phase. Pinholster does not allege, and there is no evidence to support, the dissent's assumption that trial counsel neglected to discuss the risks of testifying with their client.

ing that Pinholster intended to rob the Kumar residence on the night of the murders. In other words, counsel needed Pinholster to tell his version of the events—that he was a robber, not a burglar, and that he used guns, not knives. Given the evidence presented by the State, trial counsel's tactical decision to advise Pinholster to testify was reasonable. *See id.* Such a decision does not amount to constitutionally deficient performance. To declare that it was wrong because in hindsight it proved unsuccessful and must have been uninformed is not what the Supreme Court intended when we analyze a *Strickland* claim after the fact.

B

We also conclude that Pinholster has failed to present a colorable claim that he was prejudiced by the other alleged instances of ineffective assistance of counsel during the guilt phase of his trial.

1

One alleged instance concerned Art Corona's police interview. Through stipulation of counsel, the State introduced the unredacted tape recording and transcription of Corona's police interview. During the interview, Corona claimed that Pinholster admitted involvement in the shooting of two "wetbacks," that he had beaten an elderly woman, was involved in a cocaine "rip-off," sold drugs, committed robberies, and had affiliated with white supremacist prison gangs.[17]

The California Supreme Court rejected Pinholster's ineffective assistance of counsel claim, concluding that trial counsel had a "rational tactical reason" for deciding not to object to admission of the entire interview. *Pinholster*, 824 P.2d at 604.[18]

---

[17]Trial counsel did not object to replaying the tape during deliberations, or allowing the jury to keep the transcript while deliberating.

[18]Unlike Pinholster's other ineffective assistance of counsel claims, the California Supreme Court reached the merits of this claim in the direct appeal. It therefore constitutes the "last reasoned decision" of the state court. *See Shackleford*, 234 F.3d at 1079 n.2.

The court reasoned that "[Pinholster] needed to create an impression of candor to carry his testimony that he had broken into the Kumar house on the night of the murder[s], but had stolen the drugs and left before Corona arrived and stabbed the murder victims." *Id.* Pinholster himself testified about his violent criminal past and the references that Corona made to specific instances "simply confirmed what [Pinholster] was willing to say about himself." *Id.*

The California Supreme Court called Corona's reference to the Aryan Brotherhood "clearly innocuous," as Corona testified that it was Brown who was affiliated with the group, not Pinholster. *Id.* Moreover, the interview could reasonably be seen as favorable to Pinholster's defense. "[T]he tape contained statements inconsistent with Corona's trial testimony, showed Corona's eagerness to cooperate with the police, and contained some reference to Corona's contact with one 'Butch,' who [Pinholster] claimed was Corona's actual accomplice." *Id.* The district court denied Pinholster's motion for an evidentiary hearing because certain aspects of the tape were "beneficial to Pinholster's case" and therefore trial counsel "arguably were not deficient for failing to object to it." The district court concluded that admitting the tape was not prejudicial because the case against Pinholster was strong and the prosecution successfully discredited his defense.

**[5]** Whether counsel's actions constituted a "tactical" decision is a question of fact, and we must decide whether the state court made an unreasonable determination of the facts in light of the evidence before it. *See Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (citing *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004)). For the reasons expressed by the district court, we hold that the California Supreme Court's conclusion that counsel made a tactical decision to admit the entire tape was not an unreasonable determination of fact. Accordingly, the court's conclusion that counsel made a *reasonable* decision was not objectively

unreasonable. *See id.* (stating that the "reasonableness of counsel's decision is best described as a question of law").

2

Pinholster also claims his counsel were ineffective in failing to object to Detective Coffey's testimony. Detective Coffey testified that Terry Pinholster, Pinholster's brother, said Scott Pinholster's arrest was "no big deal" because his brother had been arrested for murder before. Pinholster argues that because he had never before been arrested or charged with murder, his trial counsel had no tactical basis for failing to object to this statement. The district court granted summary judgment to the State on this issue, concluding that Pinholster had failed to show prejudice as the jury had "already heard that [Pinholster] was involved in a shoot-out in which two 'wetbacks' had been killed. The jury could easily have surmised that [Pinholster] was arrested for murder as a result of that incident."

**[6]** Trial counsel's failure to object to this evidence raises concerns: The portion of the Corona tape discussing the "wetback" murders and the hearsay statement of Pinholster's brother undermine the heart of Pinholster's defense—that he is a robber not a murderer. Nevertheless, because the California Supreme Court's decision regarding the Corona tape was objectively reasonable, it cannot be said that Pinholster suffered prejudice from admission of his brother's statement. As the district court reasoned, it is likely the jury put the two together, making his brother's statement no more prejudicial than admission of the "wetback" statement.

3

Pinholster contends that his trial counsel were ineffective by admitting into evidence a prior felony conviction for kidnaping after the trial court granted a motion in limine to prohibit the State from using the evidence on cross-examination.

In a declaration filed with Pinholster's state and federal habeas petitions, Brainard admitted that he "d[id] not recall why [he] elicited Scott Pinholster's kidnapping conviction after the court ruled that this conviction was inadmissible for impeachment purposes."

Brainard's question opened the door for the prosecution to question Pinholster about prior offenses in which he used a knife rather than a gun. The trial court—without objection from Pinholster's attorneys—allowed the State to recall Pinholster to the stand and question him as to whether he used a knife during the course of the kidnaping. Pinholster testified that he pled guilty to using a knife but denied actually having used the knife during the commission of the offense. Although use of a knife is alleged in the criminal information, it was not a term of the plea agreement.[19] Brainard filed a declaration stating that he could "not recall whether [he] knew the knife enhancement allegation was not found true."

[7] We hold that Pinholster has failed to show a colorable claim that he was prejudiced by his trial counsel's allegedly deficient performance. The jury heard other evidence that Pinholster possessed knives, including his own admission that he used a buck knife to vandalize Lisa Tapar's car on the night of the murders. The district court properly denied Pinholster an evidentiary hearing on this ineffective assistance of counsel claim.

---

[19]The colloquy during the change of plea hearing went as follows:

The court:  Mr. Pinholster, Count I of the information charges that on August 21st of last year you kidnapped a person named Jena, J-e-n-a, Rae, R-a-e, Burdett, B-u-r-d-e-t-t; that is, that you forcefully took her from one place to another. Do you understand that charge?

Pinholster: Yes, sir.

The court:  Is that what you did?

Pinholster: Yes, sir.

4

Charles Kempf testified that during an aborted robbery attempt at Kumar's residence Pinholster bragged about stabbing an unidentified individual in the rectum. Pinholster contends that his trial counsel were ineffective for failing to object to Kempf's statement and failing to impeach Kempf with a prior statement in which he claims that Pinholster's friend did the stabbing.

[8] Pinholster cannot make out a colorable claim that he was prejudiced by the admission of this evidence. During his own testimony, which was dramatic and unusual in the candor Pinholster displayed in bragging about his life of crime, Pinholster admitted to several violent acts and the evidence presented against him was overwhelming. The California Supreme Court so found, *see Pinholster*, 824 P.2d at 601, 604, and we cannot say that the district court erred by failing to grant an evidentiary hearing.

5

During rebuttal, Eric Klemetti testified that he purchased marijuana from Johnson at the Kumar residence around 9 p.m. on the night of the murders. To impeach his credibility, Pinholster's trial counsel asked Klemetti whether he had ever committed a burglary with Pinholster, and whether he had acted as an informant during that case. Pinholster argues that this amounted to ineffective assistance because the conviction undercut his testimony that he committed robberies rather than burglaries and was otherwise inadmissible.

[9] We agree with the district court. Trial counsel made a rational tactical decision to impeach Klemetti's testimony with this evidence as the witness would have otherwise gone unchallenged. Moreover, Pinholster failed to show prejudice because he had already admitted that he burglarized Kumar's residence on the night of the murders.

6

Pinholster challenges his trial counsel's decision to admit evidence that the police had recovered narcotics during the search of his apartment. He also claims ineffective assistance due to his trial counsel's failure to exclude evidence that he had thrown a gun from the window of a different apartment while the police executed a search warrant on his apartment. Although his trial counsel challenged the officers' identification of Pinholster, Pinholster admitted during cross-examination that he threw the gun.

**[10]** The district court concluded that (1) Pinholster failed to show prejudice, as he admitted to using drugs and possessing guns in his testimony; (2) that even without Pinholster's testimony, the narcotics evidence was not prejudicial, as the jury heard from other sources, including Corona, that Pinholster used drugs; and (3) that though trial counsel attempted to challenge the officers' identification of Pinholster as the man who threw the gun, it is reasonable to believe that the jury found the officers' testimony credible. We agree and hold that the district court properly denied Pinholster's request for an evidentiary hearing.

7

Pinholster argues that trial counsel were ineffective for asking prospective jurors questions about white supremacist gangs such as the Aryan Brotherhood. The district court concluded that trial counsel were not deficient because they knew the Corona tape contained references to the Aryan Brotherhood, and they made a tactical decision to forewarn the jurors that the subject might arise. On appeal, Pinholster argues that trial counsel were ineffective for failing to object when the prosecution returned to this theme throughout the guilt phase of the trial.

**[11]** Pinholster has again failed to make a colorable claim that he was prejudiced by the alleged deficient performance.

Given the strong evidence against Pinholster, it is not reasonably probable that trial counsel's failure to exclude all references to Pinholster's connection to white supremacists affected the verdict.

## IV

We now turn to the State's appeal. The State contends that the district court improperly found, based on evidence not before the state court, that Pinholster's trial counsel inadequately investigated and deficiently presented mitigating evidence at the penalty phase. We hold that Pinholster properly exhausted his ineffective assistance of counsel claim, and that any error the district court may have committed in holding an evidentiary hearing is harmless because, even with the evidence presented at the hearing, Pinholster has not shown that he was prejudiced by counsel's failure to offer additional mitigating evidence.[20]

### A

A state prisoner must exhaust all available remedies in state court before a federal court may grant him habeas relief. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). A state prisoner must describe the operative facts and federal legal theory on which he grounds his claim so the state court has a " 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per

---

[20]The State contends the district court abused its discretion by granting Pinholster a federal evidentiary hearing. The State argues that the district court failed to consider whether Pinholster—given his shifting medical impairment theories and new lay witness declarations—properly developed a factual basis for his claim in state court. *See Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999). The State waived this issue by failing to raise it in its opening brief. *See United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005). Moreover, as we discuss *infra*, any error was harmless.

curiam) (quoting *Picard v. Connor*, 404 U.S. 270, 276 (1971)). Presenting additional facts to the district court does not evade the exhaustion requirement when the prisoner presents the substance of his claim to the state courts. *See Vasquez v. Hillery*, 474 U.S. 254, 257-58, 260 (1986) (rejecting challenge to new evidence because it did not fundamentally alter the legal claim the state courts previously considered).

[12] We review de novo whether Pinholster failed to exhaust California remedies. *See Castillo v. McFadden*, 399 F.3d 993, 998 (9th Cir. 2005). The California Supreme Court had a sufficient opportunity to hear Pinholster's claim of ineffective assistance of counsel at the penalty phase. Throughout the habeas proceedings, Pinholster has continued to press the same legal claim (ineffective assistance at the penalty phase) and the same factual basis (e.g., counsel failed to present significant mitigating evidence and, instead, presented harmful, false evidence at the penalty phase). The federal and state petitions detail many identical facts. Both describe trial counsel's failure to seek a continuance to prepare for the penalty phase; counsel's introduction of Mrs. Brashear's testimony; Pinholster's childhood home life; and Pinholster's background, including his educational, medical, psychological, social, and family history. Pinholster did not, as the State contends, "present vague and conclusory constitutional claims in the state court, phrased with sweeping generality and supported by skimpy factual allegations."

[13] Though during the proceedings Pinholster relied on different experts with differing mental impairment theories, the evolving theories have not significantly changed the evidentiary basis for his arguments. These experts relied on the same background information Pinholster presented to the state court, and their testimonies represent only a fragment of the mitigating evidence submitted in the state habeas proceedings. Accordingly, the facts adduced at the evidentiary hearing have not fundamentally altered the legal claim the California Supreme Court already considered and rejected, and we con-

clude that Pinholster has exhausted this claim. *See Weaver v. Thompson*, 197 F.3d 359, 364 (9th Cir. 1999) (rejecting exhaustion argument as "unwarranted hairsplitting" where at each step the legal claim remained the same, but the precise factual predicate for the claim changed after the evidentiary hearing).

## B

Habeas relief is proper if the California Supreme Court's decision was either "contrary to, or involved an unreasonable application of" *Strickland*.[21] *Williams*, 529 U.S. at 391 (internal quotation marks omitted). We need not determine whether Pinholster's trial counsel performed deficiently because we find the prejudice inquiry dispositive. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing of one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.").

Pinholster bears the "heavy burden" of establishing actual prejudice. *See Williams*, 529 U.S. at 394 (internal quotation marks omitted). He must demonstrate that there is a reasonable probability the sentencer would have found death unwarranted absent his counsel's errors. *Strickland*, 466 U.S. at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome. [I]t is insufficient to show only that the errors had some conceivable effect on the outcome of the proceeding, because virtually every act or omis-

---

[21]Because the California Supreme Court summarily denied Pinholster's penalty phase ineffective assistance of counsel claim, we have independently reviewed the record to ascertain whether the state court decision was objectively unreasonable. *See Himes*, 336 F.3d at 853; *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). Though unable to analyze the basis for the state court's decision, we still view the decision through the "objectively unreasonable" lens. *See Delgado*, 223 F.3d at 982.

sion of counsel would meet that test." *Williams*, 529 U.S. at 394 (quoting *Strickland*, 466 U.S. at 693-94 (citation omitted)). In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court explained that we must reweigh the evidence in aggravation against the totality of available mitigating evidence to assess prejudice. *Id.* at 534. In so doing, "we evaluate the totality of the evidence—'both that adduced at trial, and the evidence adduced in the habeas proceeding[s].' " *Id.* at 536 (emphasis omitted) (quoting *Williams*, 529 U.S. 397-98).[22]

The dissent relies heavily on the Supreme Court's decisions in *Williams*, *Wiggins*,[23] and *Rompilla*. However, as Justice O'Connor stated in her concurrence in *Rompilla*, we must apply a "case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under *Strickland.*" *Rompilla*, 545 U.S. at 393-94 (O'Connor, J., concurring). The Supreme Court has not gone so far as to say that an attorney's failure to uncover a certain class of mitigating evidence automatically results in a showing of prejudice. *See id.* Therefore, we must conduct an independent review of the evidence presented, reweighing what the State produced in the form of aggravating evidence against that which Pinholster produces in mitigation. Like the California Supreme Court, we conclude that the potential mitigating evidence is insufficient to outweigh the overwhelming aggravating evi-

---

[22]Despite Chief Judge Kozinski's misgivings, *Rompilla v. Beard*, 545 U.S. 374 (2005), does not signal a change in the Supreme Court's approach to analyzing the prejudice prong under *Strickland. See* Kozinski Concurrence at 4780. The Court's decision not to address the aggravating evidence in *Rompilla* more likely resulted from its conclusion that petitioner was clearly prejudiced from his counsel's ineffective assistance, *see* 545 U.S. at 390 ("We think Rompilla has shown beyond any doubt that counsel's lapse was prejudicial; Pennsylvania, indeed, does not even contest the claim of prejudice"), rather than from an express desire to overrule prior precedent.

[23]But even the dissent concedes that the aggravating evidence here is stronger than that in *Wiggins* because Wiggins, unlike Pinholster, did not have a record of violent conduct. *See* Dissent at 4802.

dence. We are heavily influenced by the damage Pinholster did to himself when he took the stand in the guilt phase and testified to an unrepentant life of violent crime.

[14] During the state and federal habeas proceedings, Pinholster submitted evidence to the state court showing that he suffered years of significant neglect and physical and emotional abuse as a child. Pinholster's step-father, Bud Brashear, frequently beat Pinholster with his fists, a belt, or anything else available, including a two-by-four board. Moreover, Pinholster presented evidence during the habeas proceedings that, because he resembled his biological father, he was severely beaten by his grandparents.

Pinholster painted somewhat of a different picture during a July 16, 1991, interview with a defense investigator Sheryl Duvall, who at the time worked as an independent Criminal Justice Consultant. She was hired by an attorney named Leonard Tauman to prepare a social history on Pinholster. As reflected in her interview notes, Pinholster discussed his social history, including his relationship with various family members.[24] Pinholster rejected his mother's claim that his step-father "abused" him growing up. Although he admitted that his step-father used a homemade paddle freely on him and his brothers, Pinholster claimed that they "benefitted" from the "discipline." Pinholster's primary complaint about

---

[24]The district court refused to consider statements made in Duvall's interview notes on the basis that the notes constituted inadmissible hearsay. However, the parties stipulated to the admission of these interview notes during the evidentiary hearing; Pinholster's habeas counsel made no objection based on hearsay. *See United States v. Foster*, 711 F.2d 871, 877 (9th Cir. 1983) (stating that, where there is no objection to hearsay evidence, "such evidence is to be given its natural probative effect as if it were in law admissible" (internal quotation marks omitted)). Furthermore, the Supreme Court has instructed us to " 'evaluate the totality of the evidence—both that adduced at trial, *and the evidence adduced in the habeas proceeding[s].*' " *Wiggins*, 539 U.S. at 536 (quoting *Williams*, 529 U.S. at 397-98)).

his step-father was that "he didn't seem to want the kids around."

Although Pinholster presented evidence of physical abuse from his maternal grandmother, Pinholster claimed that he and his maternal grandfather were very close. He spent summers with his grandparents, working on their chicken farm. He claimed that his "[grandfather] was affectionate with the boys. He made them work hard on the farm but he was quick to praise their efforts." Pinholster's grandfather made him feel good about himself. When Duvall asked Pinholster whether he believed his life would have been different had his grandfather lived, Pinholster responded "definitely." He claimed that, after his first arrest, he would have been sent to live with his grandparents. These sentiments were supported in a medical report developed upon Pinholster's release from the Camarillo State Hospital in 1971 when Pinholster was eleven-years-old. Pinholster was reported as being "very close" to his maternal grandfather, with his grandfather's death being an "emotional shock."

During the interview with Duvall in 1991, Pinholster also described his relationship with his mother, Mrs. Brashear. He claimed that he always "felt very close to his mother," and he had nothing but praise for her. He stated that "[s]he's always been supportive of all the kids. She's always the first there and last to leave. She always had a hot dinner on the table." At the time of the interview, Pinholster remained in close contact with his mother.[25]

---

[25]The dissent questions our consideration of Pinholster's description of his social history. *See* Dissent at 4794. We are not crediting Pinholster's description of the events over that of other family members. We recognize that Pinholster was likely beaten and abused by both his step-father and maternal grandmother. While we in no way condone such treatment of any child, our role in these inquiries is to try and assess the extent of the mitigating evidence as it relates to the potential prejudice to Pinholster. In doing so, Pinholster's own perception of his childhood and its affect on him is certainly relevant. We also find relevant the fact that Pinholster's paternal grandfather provided some stability during Pinholster's early childhood.

**[15]** In addition, the jury did hear some mitigating evidence from Pinholster's mother during her penalty phase testimony. We recognize that Mrs. Brashear inaccurately portrayed herself as a dedicated, caring mother, and, indeed, she failed to present Pinholster's troubled childhood and mental and emotional problems in the most compelling manner. Nonetheless, the jury heard mitigating facts from her testimony. Mrs. Brashear described Pinholster's strained relationship with his step-father, conceding that Bud Brashear's attempts to discipline Pinholster sometimes rose to the level of abuse.

On cross-examination, she admitted that her daughter, Tammy Brashear, was currently on probation, and that her other son, Alvin Pinholster, died after attempting to evade the authorities. Mrs. Brashaer recounted an accident when she ran over Pinholster (who was a toddler) with her car, nearly tearing off one of Pinholster's ears and causing a shoulder injury that required just over a week in the hospital. She also discussed Pinholster's second head injury resulting from another car accident; a psychologist's recommendation to commit Pinholster to a mental hospital at age ten; his time in a class for emotionally handicapped children; and his epilepsy, which she believed resulted from a severe beating at age eighteen in county jail. The penalty phase verdict reflects the jury's obvious rejection of such mitigating circumstances in light of all that Pinholster had said and done as a recidivist and the brutality of these robbery/murders.

**[16]** It is unlikely Pinholster's evidence of mental impairment would have had a significant impact on the jury. As a toddler, Pinholster was in two separate car accidents that allegedly resulted in head injuries, and throughout his childhood and early adolescence, Pinholster displayed symptoms of and received treatment for epilepsy. Nevertheless, the experts' opinions about Pinholster's psychological impairments and whether these impairments resulted from a head injury have varied considerably, becoming somewhat of a

moving target for the California Supreme Court and federal courts on habeas review.

The California Supreme Court has denied two habeas petitions, one in which Pinholster relied on Dr. Woods as his expert, and another in which he relied on Dr. Stalberg as his expert. Dr. Woods opined that, during the murders, Pinholster was substantially impaired by a bipolar mood disorder operating synergistically with a seizure disorder. Declining to present Dr. Woods's diagnosis,[26] Pinholster rehired Dr. Stalberg as his expert for the second state habeas petition. Dr. Stalberg stated that he had reviewed the materials presented by Pinholster's habeas counsel and that, had he known of "Pinholster's family history of severe psychiatric disorders, his disturbed behavior during childhood, and his irrational and highly aggressive actions immediately before the homicides," he would have "ma[de] further inquiry before concluding that [Pinholster] had merely a personality disorder." He further stated that "[t]he new material" would have "materially modified [his] opinion regarding mitigating circumstances." After the California Supreme Court again denied Pinholster's habeas petition, he appeared ready to proceed to federal court with Dr. Stalberg as his expert.

---

[26]None of the other experts agreed with Dr. Woods's diagnosis of bipolar mood disorder. In his June 2001 declaration, Dr. Stalberg stated that Pinholster "was substantially impaired by a bipolar mood disorder operating synergistically with intoxication and a seizure disorder at the time the crime was committed." However, during the evidentiary hearing, Dr. Stalberg rejected that statement as his own testimony. He stated, "I never said that and never testified to [Pinholster having bipolar mood disorder]." Subsequently, in August 2002, Dr. Stalberg filed another declaration in which he stated simply that Dr. Woods's diagnosis of bipolar mood disorder was "incorrect." Dr. David Rudnick, a neuropsychiatrist who served as an expert for the State during the federal evidentiary hearing, stated in his declaration of July 11, 2001, that "[t]here is no evidence for the diagnosis of bipolar disorder at any time in Mr. Pinholster's life." Similarly, Dr. Vinogradov stated that she found "no clear information supporting true full-blown hypomanic or depressive episodes."

On June 5, 2001, Dr. Stalberg executed a more detailed declaration in which he stated that the penalty phase testimony of Mrs. Brashear was "profoundly misleading" as she failed to truthfully describe Pinholster's early childhood, which "was marked by significant deprivation, physical abuse, and extreme neglect." Dr. Stalberg again acknowledged that Pinholster likely suffers from a seizure disorder, and went on to opine that some of the violent incidents in Pinholster's past—the breaking of his wife's jaw and his assault on Officer Kaufman—could have been attributed to his seizure disorder.

After Dr. Stalberg refused, despite all of the new mitigating evidence, to alter his diagnosis of Antisocial Personality Disorder, Pinholster's habeas counsel informed him that he would no longer be serving as their expert. Instead, in support of his amended federal habeas petition, Pinholster choose to rely on the new expert testimony of Dr. Vinogradov and Dr. Olson. Dr. Olson concluded that "it is reasonably probable that Mr. Pinholster has suffered from partial epilepsy since at least 1968." In support of his conclusion, Dr. Olson relied on the two head injuries Pinholster suffered as a child, Pinholster's abnormal EEG at age nine,[27] the descriptions of Pinholster's seizures provided by other witnesses, and Pinholster's treatment for seizures with standard anti-seizure medication.

Dr. Vinogradov relied on the same evidence as the other experts and conducted two face-to-face interviews with Pinholster. She implicitly rejected Dr. Woods's diagnosis, stating there was "no clear information supporting true full-blown hypomanic or depressive episodes." However, she diagnosed Pinholster with "personality change, aggressive type, due to

---

[27]Dr. Rudnick testified that Pinholster's abnormal EEG in 1968 could have been caused by his Attention Deficient Hyperactivity Disorder, or by the fact that he was only nine-years-old at the time. As Dr. Rudnick described, maturation of the brain is "characterized by a reduction in slow wave activity of the same frequencies observed" in Pinholster.

serious childhood head trauma." She opined that, "[o]n the night of the crimes, while intoxicated on multiple substances, Mr. Pinholster experienced perceptual aberrations and possible psychotic symptoms."

[17] The dissent believes that Pinholster has presented evidence of "substantial neurological and emotional disorders." Dissent at 4794. However, the only constant with regard to the evolving defense expert testimony has been Dr. Stalberg's diagnosis of Antisocial Personality Disorder and the experts' agreement that it is reasonably probable that Pinholster suffered from epilepsy.[28] The California Supreme Court has faced a revolving door of experts, each presenting his or her own theory on Pinholster's mental health. Although we have no pronounced reason to question the credibility of Pinholster's new experts, we conclude that no newly-minted expert theory to explain his behavior would have made a difference in the face of what Pinholster said and did.

Though the Supreme Court has recently highlighted defense counsel's constitutional duty to adequately investigate mitigating evidence, we cannot say from the record either before the state or federal district court that it was objectively

---

[28]Dr. Rudnick agreed with Dr. Stalberg's diagnosis and also noted in his declaration that John Geiger, M.D., a staff psychiatrist at San Quentin State Prison, diagnosed Pinholster with Antisocial Personality Disorder and concluded that his violent behavior was "approximately that of the average condemned area inmate." Charles E. Steinke, Ph.D., a staff psychologist at San Quentin, also agreed with Dr. Geiger's diagnosis of Antisocial Personality Disorder. We have previously noted that a diagnosis of Antisocial Personality Disorder is "potentially more harmful to [a] petitioner than [helpful]." *Gerlaugh v. Stewart*, 129 F.3d 1027, 1035 (9th Cir. 1997); *see also Daniels v. Woodford*, 428 F.3d 1181, 1204-05 (9th Cir. 2005) (concluding that the jury "never heard any mitigating psychological explanation for Daniels's behavior" because trial counsel relied solely on testimony suggesting that Daniel was a "sociopath"); *Clabourne v. Lewis*, 64 F.3d 1373, 1384 (9th Cir. 1995) (stating that omitted mental health records were "hardly . . . helpful" as they indicated that the defendant had "an antisocial personality").

unreasonable for the California Supreme Court to deny relief. While trial counsel could have presented more detailed mitigating evidence—in the form of Pinholster's social history and mental health history—that evidence falls short when compared to the mitigating evidence available in *Williams*, *Wiggins*, and *Rompilla*, and the overwhelming evidence in aggravation which Pinholster faced.

In *Williams*, had counsel performed effectively the jury would have learned that Williams's parents were imprisoned for criminal neglect; Williams's father repeatedly beat him; Williams was borderline mentally retarded and had not advanced beyond sixth grade; and, while in prison, Williams helped crack a prison drug ring, he returned a prison guard's missing wallet, and prison officials testified that he was the least likely to act violently out of all the inmates. 529 U.S. at 395-96. As the Supreme Court emphasized, this mitigating evidence coupled with the evidence the jury did hear—that "Williams turned himself in, alerting police to a crime they otherwise would never have discovered, express[ed] remorse for his actions, and cooperat[ed] with the police after that"— could have influenced the jury's view of Williams's moral culpability. *Id.* at 398. In *Williams*, the additional mitigating evidence tended to show that Williams's "violent behavior was a compulsive reaction rather than a product of cold-blooded premeditation." *Id.* Pinholster, on the other hand, presented himself to the jury as a classic antisocial personality who revels in his disobedience to the law and social mores.

In *Wiggins*, defense counsel failed to present evidence that Wiggins's mother was an alcoholic and abusive to Wiggins and his siblings, Wiggins entered foster care at age six, two foster mothers physically abused him, his second foster father repeatedly raped and molested him, he spent time homeless, and he was mentally retarded. 539 U.S. at 525, 535, 545. In finding that Wiggins was prejudiced by his counsel's ineffective assistance at the penalty phase, the Supreme Court compared Wiggins to Williams, noting that "Wiggins does not

have a record of violent conduct that could have been introduced by the State to offset this powerful mitigating narrative." *Id.* at 537. Pinholster, in contrast, is the epitome of a repeat offender who specializes in violent crimes.

In *Rompilla*, had defense counsel conducted a sufficient investigation into mitigating evidence, the jury would have learned that Rompilla's parents suffered from severe alcoholism; Rompilla's mother drank during her pregnancy, causing Rompilla to develop fetal alcohol syndrom; Rompilla and his brothers also developed serious drinking problems; Rompilla's father severely beat both Rompilla and his mother; Rompilla's mother and father fought violently, with one incident resulting in his mother stabbing his father; and that Rompilla suffered a depraved childhood, during which he was locked in a mesh dog pen, isolated from other children, and slept in an attic with no heat. 545 U.S. at 391-92. In addition, counsel would have found evidence suggesting that Rompilla suffered from schizophrenia and other mental disorders.

**[18]** In contrast to the petitioner in *Wiggins*, who had no prior convictions nor a record of violent conduct, *cf. Wiggins*, 539 U.S. at 537, Pinholster's violent past—a past Pinholster proudly boasted about to the jury—offsets the mitigating evidence. Pinholster bragged that he had committed hundreds of armed robberies within a three-year time period. In addition, he admitted to a prior kidnaping, during which he held a knife to the victim's throat. And, unlike the petitioner in *Williams*, Pinholster neither expressed remorse over the murders of Thomas Johnson and Robert Beckett, nor attempted to aid the police in their investigation. Rather, Pinholster threatened to kill the State's lead witness, Art Corona, and proudly recounted his recusant behavior in front of the jury.[29]

---

[29]During the penalty phase, the jury also heard evidence regarding the numerous threats and assaults Pinholster inflicted on law enforcement, as well as several disciplinary infractions while he was arrested and incarcerated. For example, LAPD officers Kaufman and Guzman testified that

We recognize that, at first glance, Pinholster's habeas petition more closely resembles that of the petitioner in *Rompilla*. Nevertheless, there are significant differences, and we must analyze an attorney's alleged ineffective assistance of counsel on a case-by-case approach. *See Rompilla*, 545 U.S. at 393-94, 396 (O'Connor, J., concurring). California law provides that, in determining the penalty, the jury shall consider, if relevant, "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances." Cal. Penal Code § 190.3(a). Indeed, the trial court instructed the jury that "[i]n determining which penalty is to be imposed on the Defendant, you shall consider all of the evidence which has been received during any part of the trial of this case." Here, the jury wit-

---

Pinholster kicked or attempted to kick them in the head while they tried to restrain him on different occasions. Los Angeles County Central Jail Operations Sergeant Thomas Piggott testified to some of the eleven disciplinary incidents with Pinholster involving "overt violence or some challenge to future recalcitrant type behavior." Finally, the State presented the testimony of Cathy Ann Smith. She testified that Pinholster broke her jaw while seemingly having an epileptic seizure. However, because trial counsel could have rebutted some of this aggravating evidence, we do not give it substantial weight in the reweighing of the aggravating and mitigating factors. For example, former Los Angeles County Deputy Sheriff Dale Peroutka would have testified that Pinholster "eventually [ ] turned himself around" such that Peroutka and other deputies recommended to reclassify Pinholster from administrative segregation to the general population. Peroutka no longer saw Pinholster as a danger to other deputies or inmates; he reached an agreement with Pinholster that he could join the general population if he behaved and complied with the rules. Likewise, trial counsel could have diminished the impact of a serious disciplinary infraction admitted by stipulation. Allan Page Crowder, the corrections officer Pinholster allegedly threatened to throw off a tier in state prison, would have testified that had he been a more seasoned officer, he would not have considered the 1978 verbal altercation worthy of a CDC 115 disciplinary report. Nevertheless, because we find other more substantial aggravating evidence in the record, this newfound mitigating evidence does not change our ultimate conclusion that no reasonable juror would have been persuaded to change his vote.

nessed first-hand Pinholster's lack of remorse. *Cf. Schriro v. Landrigan*, 127 S. Ct. 1933, 1944 (2007) (noting that the "postconviction court was well acquainted with Landrigan's exceedingly violent past and had seen first hand his belligerent behavior"); *see also id.* ("In his comments [to the sentencing judge], defendant not only failed to show remorse or offer mitigating evidence, but he flaunted his menancing behavior." (internal quotation marks and first alteration omitted)). Justice Mosk specifically emphasized that point in authoring the decision for the California Supreme Court: "[Pinholster] himself made his criminal disposition clear [to the jury.] In fact, he gloried in it." *Pinholster*, 824 P.2d at 611.

[19] Pinholster viciously beat the two murder victims, repeatedly stabbed them with a knife, and took their wallets for a gain of $23 and a quarter-ounce of marijuana.[30] Yet, under oath, Pinholster denied murdering the victims and bragged about the successful hundred-plus robberies he had previously committed. Pinholster called himself a "profes-

---

[30]The dissent questions the heinousness of these murders, comparing this factual scenario with those found in *Belmontes v. Brown*, 414 F.3d 1094 (9th Cir. 2005), *rev'd on other grounds*, *Ayers v. Belmontes*, 127 S. Ct. 469 (2006); *Hovey v. Ayers*, 458 F.3d 892 (9th Cir. 2006); and *Fields v. Brown*, 431 F.3d 1186 (9th Cir. 2005). Dissent at 4797-99. However, for the jury charged with the duty of weighing the mitigating and aggravating factors in determining whether this defendant should receive a life sentence or suffer death, these separate, unconnected murders are irrelevant. Unlike a trial judge who may try several murder cases, or an appellate court that may review several different murder convictions in those states imposing a proportionality review on appeal in capital cases, this is likely the first and only time these jury members will become so intimate with facts involving the taking of human lives. The jury does not compare one murder to another, ranking the heinousness of the individual crimes on some imaginary scale. California does not require a proportionality review as do some other states in death penalty cases. Rather, as the Supreme Court has directed appellate courts to do, juries also consider the underlying facts of a death penalty case on an individualized case-by-case basis in weighing the aggravating and mitigating facts. Cal. Penal Code § 190.3. We do not share our colleague's view that this was not a particularly heinous double homicide.

sional robber," and testified that he often wrote his name and scratched swastikas on other people's property as a "sideline to robbery."[31] Moreover, the jury heard evidence that Pinholster was previously convicted for kidnaping, that he threatened to kill the State's lead witness, and that, in a jealous rage, Pinholster slashed the arm of Thomas Mesquita with a straight razor.

Pinholster's detailed account of his version of the events on the night of the murders would obviously affect the jury's view of Pinholster's mental impairment evidence. And, the jury also observed firsthand on the witness stand an individual who failed to respect the gravitas of the multiple murder trial through his unrepentant attitude. In addition to taking pride in his criminal background, Pinholster was openly disrespectful of the deputy prosecutor and ignored the seriousness of his underlying murders. The record reflects that Pinholster was either laughing or smirking during numerous stages of the deputy prosecutor's cross-examination.

**[20]** We cannot ignore the fact that, even while hearing Pinholster's defense in the guilt phase of the trial, the jury was considering facts that were also relevant to appropriate punishment. *See* Cal. Penal Code § 190.3(a). In his testimony, Pinholster portrayed himself as a career criminal who reveled in his antisocial persona. As Dr. Rudnick explained in his declaration, "individuals with Antisocial Personality Disorder may have an inflated and arrogant self-appraisal, behave in a cocky or self-assured manner, lack realistic concern about their problems and display a glib, superficial charm."[32] The

---

[31]Dr. Rudnick stated that "[Pinholster's] behavior at Lisa Tapar's house was a clear, angry reaction to having the door closed on him. After stabbing the door, he performed the very deliberate, aggressive act of carving various Nazi symbols on Lisa's car." This analysis, along with Pinholster's ability to give a detailed description of his actions during this event, would not have been forgotten by the jury considering any of the newly proffered mitigating evidence.

[32]As detailed above, Dr. Woods used Pinholster's behavior at trial to support his diagnosis of bipolar mood disorder. Given that Pinholster

California Supreme Court, which acknowledged the fact that Pinholster "gloried" in his criminal history, could reasonably have concluded that no amount of clever "after-the-fact" assessment by habeas defense psychiatrists would have convinced even a single juror to change his vote.

V

We affirm the district court's denial of Pinholster's request for an evidentiary hearing on ineffective assistance of counsel at the guilt phase and remand for dismissal of the petition. We reverse the district court's grant of habeas relief on his ineffective assistance of counsel claim at the penalty phase.

AFFIRMED in part, REVERSED in part, VACATED, and REMANDED.

---

chose not to rely on Dr. Woods's diagnosis in his federal habeas petition, and that both Dr. Stalberg and Dr. Rudnick discredit this diagnosis, we cannot believe the jury would have given it much weight.

KOZINSKI, Chief Judge, concurring:

I join Judge Tallman's opinion in full, but I do have one misgiving: I'm not sure whether *Rompilla* v. *Beard*, 545 U.S. 374, 393 (2005), still allows us to "reweigh the evidence in aggravation against the totality of available mitigating evidence," *Wiggins* v. *Smith*, 539 U.S. 510, 534 (2003), when counsel fails to uncover mitigating evidence. After all, counsel failed to uncover mitigating evidence in *Rompilla*, and the Supreme Court didn't seem to address the aggravating evidence in assessing prejudice. *See Rompilla*, 545 U.S. at 393. Still, I have a hard time believing that *Rompilla* overruled a recent case like *Wiggins* without bothering to say so. *See id.* (quoting *Wiggins*, 539 U.S. at 538).

*Rompilla* devotes most of its analysis to describing counsel's deficiencies, not to assessing the prejudice to petitioner. The Court found that counsel were ineffective in *Rompilla* because they failed to adequately prepare for a penalty phase hearing where the prosecution focused on petitioner's prior conviction, *not* because they failed to look for evidence of childhood abuse. *See Rompilla*, 545 U.S. at 394-96 (O'Connor, J., concurring). As Justice O'Connor's linchpin concurrence made clear, counsel's "trial-preparation" there was deficient because they failed to obtain petitioner's prior conviction file in anticipation of a hearing where the prosecution would focus on that conviction. *Id.* at 395. Had defense counsel properly prepared for the hearing by obtaining that file, they would have stumbled across a cache of valuable evi-

dence of childhood abuse and mental defect. *Id.* at 390-91 (majority opinion). I read *Rompilla* for the unremarkable proposition that counsel must take the steps a reasonable lawyer would take in preparing for a hearing, not that counsel are always ineffective for failing to uncover childhood mitigating evidence.

I would therefore find (as an alternative ground for reversal) that petitioner's counsel weren't deficient, because they made a rational decision to pursue what was essentially a "pity" mitigation case, rather than try to make out a case of mental defect. Counsel faced a difficult situation: During the guilt phase, petitioner portrayed himself as a career criminal and boasted that he had committed hundreds of robberies using a gun. And petitioner admitted to breaking into Kumar's house on the night of the murders. The jury had ample opportunity to evaluate petitioner's demeanor. Counsel may well have felt that petitioner's articulate and coherent testimony portrayed him as a clever liar, not as someone who is mentally deficient. This conclusion would have been bolstered by Dr. Stalberg, who evaluated petitioner's mental state and found him essentially normal. While Dr. Stalberg has since flipped a couple of times in his conclusions, petitioner doesn't rely on him now, so we can't say that Dr. Stalberg would ultimately have come up with a helpful diagnosis, had petitioner's lawyers only given him more facts. Petitioner's new lawyers did eventually manage to find psychiatrists willing to say he is mentally impaired, but trial counsel had no reason to believe that they could swiftly find another doctor who would disagree with their own expert's diagnosis.

Under these circumstances, it was reasonable for them to eschew a mental defect defense and pursue another mitigation strategy. Ultimately, they focused on petitioner's mother, who testified about his head injuries, his disruptive behavior in school, a psychologist's recommendation that she commit him to a mental hospital, his frequent stays at juvenile hall and his epilepsy. The dissent chastises trial counsel for making "no

investigation into Pinholster's background at all," dissent at 4790, but I don't see why talking to a defendant's mother doesn't count as an investigation into his background. The investigation may not have been as thorough as our dissenting colleague would have preferred, but surely it's wrong to say that defense counsel conducted no investigation at all.

Petitioner's mother was not the perfect mitigation witness, but it's not clear that petitioner *had* a perfect mitigation witness. Nor is perfection the standard; the question is whether, applying the broad deference due to counsel under *Strickland* v. *Washington*, 466 U.S. 668, 690-91 (1984), and the even broader deference due to the California Supreme Court under AEDPA, 28 U.S.C. § 2254(d), we can say that counsel's decision is wholly unreasonable. This was not a case like *Rompilla* or *Williams* v. *Taylor*, 529 U.S. 362, 395 (2000), where review of a single file would have yielded a treasure trove of mitigating evidence; finding all the evidence that petitioner's current lawyers have amassed after years of effort and expert-shopping was simply beyond the time and resources available to counsel at the time of trial.

Justice O'Connor's concurrence in *Rompilla* reaffirmed the "longstanding case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient." *Rompilla*, 545 U.S. at 394 (O'Connor, J., concurring). *Rompilla* involved a particular hearing regarding petitioner's prior conviction, and because counsel failed to adequately prepare for that hearing by obtaining petitioner's prior conviction file, counsel were unable to adequately rebut the prior conviction evidence. *See id.* at 394-96. This was a discrete, precisely identifiable strategy—"a sure bet," *id.* at 389 (majority opinion)—that no competent counsel could overlook or bypass. It is quite different from counsel's debatable judgment call here as to how best to present their mitigation case —after petitioner portrayed himself as a career criminal at the guilt phase and their mental expert found no basis for mitigation. Under a "case-by-case approach," *id.* at 394 (O'Connor,

J., concurring), I can't say that counsel's decision to focus solely on petitioner's mother was unreasonable in these difficult circumstances. Nor was the state court unreasonable in finding that petitioner's constitutional rights were not violated.

---

FISHER, Circuit Judge, dissenting:

I respectfully dissent. This case is controlled by a trio of recent Supreme Court decisions holding that petitioners' Sixth Amendment rights were violated when their lawyers failed to present available mitigating evidence during the penalty phases of their capital trials. *See Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000). The majority's attempts to distinguish these cases are not persuasive. Pinholster's counsel performed at least as deficiently as the lawyers in the Court's recent decisions; and Pinholster was prejudiced as a result since the mitigating evidence that could have been introduced on his behalf was at least as strong as that in *Williams*, *Wiggins* and *Rompilla*, and the aggravating evidence against him was if anything weaker than that in *Williams* and *Rompilla*. Binding Supreme Court precedent therefore compels the conclusion that the state court's summary denial of Pinholster's penalty phase ineffective assistance of counsel (IAC) claim was objectively unreasonable. I would therefore remand for the district court to issue a writ vacating Pinholster's sentence, unless within a reasonable time set by the court the State conducts a new penalty phase trial or imposes a lesser sentence consistent with law.

## I.

Before addressing the majority's penalty phase analysis, I pause to note my partial disagreement with its resolution of Pinholster's guilt phase IAC claim. I agree that the district

court did not err in denying Pinholster's request for an evidentiary hearing on that claim, but I would base that conclusion solely on Pinholster's failure to present a colorable claim of prejudice. I cannot agree with the majority's conclusion that counsel's decision to advise Pinholster to testify was a reasonable tactical choice rather than deficient performance.[1]

Pinholster's counsel advised him to testify to a defense that was not only implausible and nonsensical, but also demonstrably false. There was compelling evidence disproving almost every facet of the defense's case. First, contrary to Pinholster's claim that he was a gun-toting robber and not a knife-wielding burglar, several witnesses testified at trial that they saw Pinholster carrying a large buck knife immediately before and after the murders. Pinholster himself admitted to carrying a knife on the night of the murders, and a knife sheath was found in his pocket when he was arrested. Pinholster also testified, contrary to his claim that he was not a burglar, that he had burglarized Kumar's home just hours before the murders took place. In contrast, Corona testified that he and Pinholster went to Kumar's house on the night of the murders intending to rob Kumar, and that the intended robbery turned into a burglary only when they found Kumar's home unoccupied. Corona — the State's lead witness — thus gave testimony that was more consistent with Pinholster's

---

[1]I also disagree with the majority's conclusion that the California Supreme Court reasonably concluded that Pinholster's counsel was effective in failing to object to highly prejudicial evidence suggesting that Pinholster murdered two other individuals in Sun Valley. That court's conclusion was based entirely on the assumption that the evidence would assist Pinholster's defense. However, Pinholster's defense was irrational and should have never been put forth. The California Supreme Court also failed to consider whether Pinholster could have received the same benefit in terms of "candor," *People v. Pinholster*, 824 P.2d 571, 604 (Cal. 1992), by requesting redaction of the prior murder evidence from the Corona tape and allowing the remainder to be played. Finally, as the prosecution never produced evidence that two Latino men were killed in a shootout in Sun Valley, it appears that Corona's prior murder comments were simply untrue.

defense than even Pinholster's own testimony. The second part of Pinholster's alibi — that he was at Kumar's residence before and not after his visit to Tapar's house — was also disproved at trial. Contrary to Pinholster's statement that he went to Tapar's residence by himself in order to tell her about Shotgun's death, Tapar testified that she did not know Shotgun and that Pinholster arrived in Corona's car and appeared intent on robbing Kumar. Even more damaging was Klemetti's testimony that he was at Kumar's house at 9 p.m. and found no signs of the burglary that Pinholster claimed to have committed at 8 p.m.

On its own, counsel's chosen defense was misguided. But in light of counsel's additional failure to investigate important physical evidence, including the palm print and the boot print, it amounted to deficient performance.[2] Although a defendant's right to testify is his own and may not be overridden by counsel, counsel nonetheless has the responsibility to independently investigate and challenge a defendant's implausible story. *See Phillips v. Woodford*, 267 F.3d 966, 978-79 (9th Cir. 2001) (stating that an attorney has an obligation to investigate defendant's " 'incredibly lame' " alibi and " 'confront the petitioner with the difficulties of his story' " (quoting *Johnson v. Baldwin*, 114 F.3d 835, 838, 840 (9th Cir. 1997)).

---

[2]The majority suggests that Pinholster suffered less prejudice from his counsels' failure to investigate the palm print, because counsel "merely stated that he *probably*" would have advised Pinholster not to testify had he known of evidence that the palm print found at the crime scene did not match Pinholster's palm. *See* Maj. Op. at 4753 & n.13. The question is not what Pinholster's ineffective counsel would have done but rather what effective counsel would have done. Competent counsel would have *certainly* advised Pinholster not to testify. Nor do I agree that the existence of only a "battle of the experts" with regard to the palm print evidence somehow reduces the prejudice from counsel's failure to investigate. *See id.* at 4754-55. Evidence that creates a "battle of the experts" is precisely the type of evidence that gives rise to reasonable doubt, and thus will typically support a finding of prejudice. In this case it is only because *other* evidence overwhelmingly shows Pinholster's guilt that the new palm print evidence does not amount to prejudice.

Here, an investigation would have revealed that Pinholster's alibi was highly suspect, giving rise to counsel's obligation to advise Pinholster against testifying, because the jury would likely conclude he was lying.[3] *See also id.* at 979 (" 'The prejudice from failing to investigate the alibi and confer more fully with petitioner is not avoided by the fact the petitioner misinformed his attorney.' ") (quoting *Johnson*, 114 F.3d at 840). At the very least, counsel's shortcoming in this regard makes out a colorable claim of deficient performance for purposes of obtaining an evidentiary hearing. *See id.* (noting that the "colorable claim" standard is "far less onerous" than the standard for granting the writ); *see also Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005) (describing the "colorable claim" standard as "a low bar").

Nonetheless, I agree that Pinholster has failed to present a colorable claim of prejudice. There was overwhelming evidence of Pinholster's guilt, including: Art Corona's eyewitness testimony of the murders; Casey Corona's testimony that she saw Pinholster washing blood off his knife soon after the murders while stating "[i]t had to be done the way it was done"; Kempf's testimony that Pinholster stated — while clutching his buck knife — that he wanted to rob Kumar "one way or the other"; Tapar's testimony that Pinholster appeared at her door with a knife just before the murders and that she had the impression that Pinholster intended to steal from Kumar; and evidence that one Gian Norelli had heard Pinholster brag about stabbing two people in Tarzana, where Kumar lived. In light of this evidence, it is difficult to conceive of any reasonable juror not voting to convict absent a convincing defense theory. Pinholster has failed to articulate such a

---

[3]The majority's insistence that Pinholster's counsel were not ineffective because Pinholster was "eager to take the stand" is not illuminating. Maj. Op. at 4753. Counsels' deficient failure to investigate Pinholster's alibi defense, which in turn rendered them unable to provide competent advice about whether he should testify, made it impossible for Pinholster to make an informed decision as to whether he should exercise his constitutional right to do so.

defense theory. *Cf. Phillips*, 267 F.3d at 980-81 (gauging whether there was a colorable claim of prejudice by comparing the deficient defense presented at trial to a proposed alternative defense). For this reason alone, I would hold that the district court appropriately denied Pinholster an evidentiary hearing on guilt phase ineffective assistance and, necessarily, that the district court properly denied habeas relief with regard to guilt.

Notwithstanding that counsel's deficiencies were not prejudicial at the guilt phase, I would hold that they added considerably to the prejudice Pinholster suffered at the penalty phase. Counsel's deficient performance at the guilt phase resulted in the jury hearing Pinholster boast about committing hundreds of robberies as well as other damaging evidence suggesting that Pinholster murdered two men. The majority itself makes evident that counsel's failure to advise Pinholster against taking the stand during the guilt phase was prejudicial at the penalty phase, because it repeatedly invokes the "damage Pinholster did to himself when he took the stand in the guilt phase and testified to an unrepentant life of violent crime." *See* Maj. Op. at 4767; *see also id.* at 4772 ("[N]o newly-minted expert theory to explain his behavior would have made a difference in the face of what Pinholster said and did."); *id.* at 4774 (noting that any mitigating evidence would have been offset when Pinholster "proudly boasted to the jury" about his life of crime). The same jury that decided Pinholster's guilt went on to decide his penalty, so the harmful guilt phase evidence undoubtedly added to the other prejudicial errors Pinholster's counsel committed at the penalty phase, to which I now turn.

## II.

The majority holds that the California Supreme Court's summary denial of Pinholster's penalty phase IAC claim was not objectively unreasonable. I disagree. In my view, the Supreme Court's recent decisions in *Williams*, *Wiggins* and

*Rompilla* compel the conclusion that Pinholster's counsel performed deficiently and that Pinholster was prejudiced as a result. The state court's ruling to the contrary was indeed an "unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

**A.**

The majority proceeds straight to the prejudice prong of the IAC inquiry and does not contend that Pinholster's trial counsel performed competently. *See* Maj. Op. at 4765. This is a wise decision, because counsel manifestly failed to satisfy the professional standards for penalty phase representation. The Supreme Court has held that "trial counsel [must] conduct a thorough investigation of the defendant's background." *Williams*, 529 U.S. at 396 (citing the applicable American Bar Association standards); *see also Rompilla*, 545 U.S. at 387 & n.7; *Wiggins*, 539 U.S. at 524 ("[I]nvestigations into mitigating evidence should comprise efforts to discover *all reasonably available* mitigating evidence . . . .") (internal quotation marks omitted). Employing this approach, the Court found deficient performance — despite AEDPA's deferential standard of review — in *Williams*, *Wiggins*, and *Rompilla*. In *Williams*, counsel began to prepare for the penalty phase less than a week before trial, presented only four witnesses and "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood." 529 U.S. at 369, 395. In *Wiggins*, counsel presented no evidence of the petitioner's life history or family background, and failed to consult documentary evidence beyond the petitioner's presentence investigation (PSI) report and Department of Social Services (DSS) records. *See* 539 U.S. at 516, 524-29. And in *Rompilla*, counsel presented five witnesses during the penalty phase and reviewed the reports of three mental health experts, but failed to examine the petitioner's prior conviction file even though the prosecution had

declared its intention to introduce that file's contents at trial. *See* 545 U.S. at 381-86.

Pinholster's attorneys plainly performed even more deficiently than the lawyers in *Williams*, *Wiggins* and *Rompilla*. According to billing records, they spent only 6.5 hours preparing for the penalty phase of Pinholster's trial. One week before the penalty phase began, counsel admitted that they "had not prepared any evidence by way of mitigation," and then declined to request a continuance so that they could conduct a proper investigation, telling the court that they did not think more time "would make a great deal of difference." They obtained no medical or psychological records, law enforcement records or school reports for Pinholster or his siblings, even though all of this documentary evidence was readily available. They failed to provide the psychiatrist they retained, Dr. Stalberg, with any of the materials he needed to evaluate Pinholster properly. They interviewed and presented just one witness, Pinholster's mother, whose testimony at trial was highly misleading and self-serving. They waived their opening statement in the penalty phase. If the lawyers in *Williams* and *Rompilla* performed deficiently even though they interviewed and presented multiple witnesses, and if counsel's performance in *Wiggins* was deficient despite the examination of the petitioner's PSI report and DSS records, then Pinholster's attorneys cannot have satisfied the professional standards for penalty phase representation. It is not reasonable for a lawyer to interview and present just one witness, to fail to uncover abundant readily available mitigating evidence and to spend less than a day preparing for a proceeding at which the jury will decide whether the lawyer's client should live or die.

Chief Judge Kozinski, concurring, suggests that this performance was not deficient because counsel "made a rational decision to pursue what was essentially a 'pity' mitigation case, rather than trying to make out a case of mental defect." Concurring Op. at 4781. Relying almost exclusively on Justice O'Connor's nonbinding concurrence in *Rompilla*, he

argues that *Rompilla* stands only for the "unremarkable proposition" that counsel must take reasonable steps to prepare for a hearing, not "that counsel are always ineffective for failing to uncover childhood mitigating evidence." *Id*. Even if he were correct that *Rompilla*'s holding is so limited, however, the same cannot be said for *Williams*, where the Court noted that it was "*barely disputed*" that counsel were ineffective where, as here, they "did not begin to prepare for [the penalty] phase of the proceeding until a week before the trial" and "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." 529 U.S. at 395 (emphasis added).

In this case, counsel failed to conduct an investigation into Pinholster's background — not through any mistake of law, but through apathy or negligence. This hardly seems to be a more defensible strategic choice. Although in certain cases counsel may have "sound reason to think it would have been pointless to spend time and money on . . . additional investigation," and hence counsel's failure to uncover additional mitigating evidence would not be unreasonable, here there was no investigation into Pinholster's background at all, beyond interviewing his mother. *Rompilla*, 545 U.S. at 383. Where no meaningful investigation is even attempted, counsel could hardly have developed any "sound reason" to think that "*additional* investigation" would be fruitless. *Id*. (emphasis added); *see also id*. at 389 (explaining that conducting further investigation may not be necessary "when a lawyer *truly has reason to doubt*" that further useful mitigating information will be found) (emphasis added). Here counsel not only conducted the very barest kind of investigation, they failed to conduct any follow-up investigation into the limited mitigating evidence that they *did* learn from Pinholster's mother, such as evidence that Pinholster suffered from epilepsy. Thus even where counsel developed "sound reason" to believe that

further investigation would yield fruitful evidence, counsel utterly neglected that duty. *Id.*

Lastly, contrary to Chief Judge Kozinski's suggestion, counsel could not have made a "rational decision" to pursue a mitigation strategy that relied solely on Pinholster's mother's inaccurate testimony, when counsel failed to explore meaningfully any other options. *See* Concurring Op. at 4781. As the Court has explained, the question is "not whether counsel should have presented a mitigation case," but "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable*." *See Wiggins*, 539 U.S. at 523. Even if one could hypothesize a world in which relying on Pinholster's mother's testimony and eschewing a mental defect defense was a reasonable defense strategy, Pinholster's counsel could not have made such a strategic decision where they "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* at 524. Counsel's failure to investigate here was even more flagrant than in *Williams*, *Wiggins* or *Rompilla*, and so was manifestly unreasonable under clearly established Supreme Court law.

## B.

### 1.

The majority holds that even if the performance of Pinholster's counsel was deficient, it was not objectively unreasonable for the state court to rule that Pinholster was not thereby prejudiced. In reaching this conclusion, the majority minimizes or ignores much of the mitigating evidence that Pinholster could have presented, overstates the value of what little mitigating evidence was actually put before the jury, and exaggerates the aggravating evidence that was introduced against him. The majority thus imposes a much more stringent test for prejudice than is required by *Strickland v. Washing-*

*ton*, 466 U.S. 668 (1984), and its progeny. While it is true that Pinholster must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," the Court has emphasized that a reasonable probability is less than the preponderance more-likely-than-not standard. *See Strickland*, 466 U.S. at 693-94; *see also Rompilla*, 545 U.S. at 393 ("[A]lthough we suppose it is possible that [the sentencer] could have heard it all and still decided on the death penalty, that is not the test."). The gap between the evidence that was presented and what could have been presented is more than sufficient to "undermine confidence in the outcome" of the proceeding. *See Strickland*, 466 U.S. at 694.

Beginning with the available mitigating evidence, the majority ignores or downplays much of the probative information that Pinholster could have presented at trial. First, the "years of significant neglect and physical and emotional abuse" that Pinholster experienced as a child were not, as the majority implies, limited to the beatings by his stepfather and grandmother. Maj. Op. at 4767-68. His birth father, Garland Pinholster, abandoned the family when Pinholster was an infant. Pinholster's family was extremely poor, to the point that the children would sometimes mix flour and water when they were hungry. Neither Pinholster's stepfather nor his mother evinced any concern for Pinholster and his siblings. Indeed, Pinholster's mother often laughed when her children behaved inappropriately, encouraged them to steal from nearby rail cars and dressed the children in rags while buying mink coats for herself.

Second, the lives of Pinholster's siblings were worse than the majority indicates. Pinholster's half-sister, Tammy Brashear, was convicted of prostitution and forcible sexual battery, and became a ward of the juvenile court when she was 16. Pinholster's brother, Alvin Pinholster, was arrested for robbery, rape, sodomy and other offenses, suffered from severe depression and schizophrenia and eventually committed sui-

cide. Pinholster's other brother, Terry Pinholster, suffered from depression and became a user of PCP. And Pinholster's half-brother, Guy Pinholster, suffered from depression as well as bipolar mood disorder, and was frequently beaten by his father.

Third, Pinholster's own medical history is more problematic than the majority acknowledges. He suffered his first head injury at age two when he was run over by his mother's car, resulting in a two-week hospital stay. He suffered a second severe head injury a year later, during a car accident in which Pinholster's head hit the front windshield hard enough to shatter the glass. According to Dr. Woods, these injuries at the very least supported a post-traumatic diagnosis, and may have accounted for the abnormal EEG that Pinholster recorded as a child. Similarly, Dr. Olson and Dr. Vinogradov stated that the injuries damaged Pinholster's brain and caused him to become more aggressive, while Dr. Stalberg described the injuries as potentially "devastating" and linked them to Pinholster's epilepsy. That epilepsy was severe enough that Pinholster was prescribed medication from age nine onward and repeatedly suffered complex partial and grand mal seizures. Different doctors also diagnosed Pinholster with bipolar mood disorder (Dr. Woods) and personality change due to childhood head trauma (Dr. Olson and Dr. Vinogradov), while agreeing that he was epileptic. At age 11, Pinholster spent more than four months in a mental institution.

Fourth, the majority does not even acknowledge that Pinholster had severe learning disabilities in school and was socially isolated and maladjusted as a child. According to his elementary school teacher, Lois Rainwater, Pinholster "had no friends at all," "seemed incapable of relating either to his peers or to adults," "seemed like a child who got no attention or structure at home" and "fell through the cracks emotionally and every other way." Lastly, Pinholster had a history of abusing alcohol, nicotine, marijuana, and heroin. He started drinking alcohol, smoking, sniffing glue and paint and using

marijuana between the ages of 10 and 12; using Seconal and downers between the ages of 13 and 14; and using heroin and cocaine between the ages of 14 and 16. On the night of the events in question, Pinholster was heavily intoxicated with both alcohol and drugs.

Instead of discussing this substantial available mitigating evidence that was not put before the jury, the majority instead dwells on an interview Pinholster gave to a social worker in 1991, where he downplayed the extent of the abuse he suffered as a child. *See* Maj. Op. at 4767-69. Although the majority acknowledges that Pinholster's stepfather "frequently beat Pinholster with his fists, a belt, or anything else available, including a two-by-four board," the majority nonetheless focuses on Pinholster's — the abused child's — interpretation of these events as nothing but "discipline" that "benefitted" him and his brothers. *Id.* at 4767-68. Further, while the majority goes on at length about the positive relationship Pinholster may have with his maternal grandfather, Pinholster's uncle and aunt testified that it was Pinholster's *grandmother* who would frequently "beat the hell out of" Pinholster from the time when he was a toddler. Every medical professional who evaluated Pinholster concluded that he suffered severe abuse and neglect in his childhood. Further, multiple doctors who evaluated Pinholster noted his tendency to portray his own history inaccurately or minimize the seriousness of his childhood trauma so as to maintain a facade of personal control. The majority's emphasis on Pinholster's rationalization of his mother's neglect therefore seems rather myopic if not disingenuous.

The majority also attempts to minimize the evidence of Pinholster's substantial neurological and emotional disorders by emphasizing disagreements among the experts as to some diagnoses, and stating that "the only constant with regards to the evolving defense expert testimony has been Dr. Stalberg's diagnosis of Antisocial Personality Disorder and the experts' agreement that it is reasonably probable that Pinholster suf-

fered from epilepsy." Maj. Op. at 4772. It is unclear why the majority dismisses the importance of these diagnoses, which are clearly sufficient of themselves to indicate an organic basis for some of Pinholster's behavior. Further, Dr. Woods concluded that Pinholster suffered from bipolar mood disorder and Dr. Olson and Dr. Vinogradov concluded that Pinholster suffered from brain damage attributable to childhood trauma, which may have explained in part his aggressive behavior. Even if not all experts concurred on the exact set of diagnoses, numerous doctors agreed that Pinholster suffered from psychological disorders that may have influenced his criminal acts. Further, this medical testimony might have also affected the jury's interpretation of Pinholster's guilt phase testimony, again by suggesting an organic basis for his tendency to exaggerate his past. Yet none of this medical evidence or testimony was put before the jury to evaluate, and the majority acknowledges that it has no reason to doubt the credibility of these medical professionals.

The majority also gives too much credit to the penalty phase testimony of Pinholster's mother, Burnice Brashear. While Brashear's testimony did include some "mitigating evidence," *see id.* at 4769 — as was inevitable given Pinholster's horrific childhood — the overall impression she conveyed of Pinholster's upbringing was not just incomplete but actually untrue. Contrary to her statements in court, Pinholster's siblings were not "[b]asically very good children," and they got into much more than "small trouble" with drugs, alcohol and the law. The beatings that Pinholster endured at the hands of his stepfather were quite certainly child abuse, not mere "discipline" or "arguments and hassles," as Brashear also characterized them. Pinholster and his siblings did not have "everything normally materialwise that most people have," "decent clothes" and "a nice house," but instead suffered from malnutrition, lack of clothing and neglect. Pinholster's epilepsy was first diagnosed at age nine, not after he was beaten at age 18. And Pinholster did not do "much better" at school after being diagnosed with "perceptive vision" and moved to

a different classroom; rather, his academic performance continued to decline, and by his teenage years he was being shuffled from one institutional setting to another. Instead of minimizing the damage done by Brashear's testimony, I would simply adhere to the conclusions of Dr. Stalberg and the district court. Dr. Stalberg described Brashear's statements as "profoundly misleading," while the district court opined that "[t]he available evidence 'was far different from the unfocused snapshot' presented by Pinholster's attorneys at trial." Hence the majority attributes false weight to the jury's supposedly "obvious rejection of such mitigating circumstances." *Id.* at 4769. The jury was not presented with an accurate picture of the mitigating circumstances, so it hardly could have rejected them.

Finally, the majority not only overvalues Brashear's testimony, but also ignores the way in which its deficiencies were turned against Pinholster by the prosecution. During the penalty phase closing arguments, the State was able to claim, on the basis of Brashear's inaccurate statements, that Pinholster had resorted to crime and violence even though he "came from a good home," "was not a deprived child" and "had many things going for him, probably more than many children." The State also was able to discount Brashear's testimony about Pinholster's epilepsy — and indeed to accuse her of lying about it — by pointing to the complete lack of corroborating evidence as well as her own ignorance about the condition. On cross-examination, Brashear stated that she did not know what type of epilepsy Pinholster had, that she was unsure when she found out about the condition and that on one occasion she had taken Pinholster to a doctor and, as the prosecutor put it, "lo and behold, just like that the doctor told them he had epilepsy." Brashear's flawed testimony, in combination with Pinholster's counsel's failure to present any other evidence in mitigation, thus made possible the State's devastating conclusion: "What did the defendant proffer in this particular case as to ask you to come back with anything less than death? . . . Not one person except his mother." *Cf.*

*Karis v. Calderon*, 283 F.3d 1117, 1139 (9th Cir. 2002) (finding prejudice in part because "[t]he defense counsel's portrayal of [petitioner] as intelligent without any indication of his violent and abusive childhood afforded the prosecution a very effective argument," and enabled "[t]he prosecutor [to] emphasize[ ] the fact that [petitioner] was 'bright' and 'cunning' and that he 'well knew exactly what he was doing' ").

**2.**

On the other side of the ledger, the majority describes the aggravating evidence that was introduced against Pinholster as "overwhelming." Maj. Op. at 4766, 4773. This evidence must not be understated, and Pinholster is obviously not a sympathetic person, but deeming the aggravating evidence "overwhelming" does not make it so. First, the murders themselves were not as heinous as many of the other terrible crimes that we have considered in capital cases. Pinholster did not intend to kill anyone when he went to Kumar's house, and indeed was surprised when the housesitters, Johnson and Beckett, arrived at the scene. Thus to the extent there was any premeditation, it formed immediately before the instant offenses took place, when a drunk, high and emotionally distraught Pinholster and his two codefendants, Corona and Brown, suddenly discovered that they were not alone in Kumar's house. Moreover, Brown stabbed Johnson as well and said that he had " 'buried his knife to the hilt' " in him, meaning that it is uncertain whether Pinholster was responsible for Johnson's fatal wounds. *See Pinholster*, 824 P.2d at 582-84.

We have previously described a very similar crime as "in essence a robbery gone wrong." *Belmontes v. Brown*, 414 F.3d 1094, 1139 (9th Cir. 2005), *rev'd on other grounds*, *Ayers v. Belmontes*, 127 S. Ct. 469 (2006). We commented in *Belmontes* that the murder, which involved the bludgeoning of a single victim with an iron bar during a robbery, "was not pre-planned, nor did it involve kidnapping, rape, torture . . .

or any of the other especially heinous elements that usually are present when a jury votes for the ultimate penalty." *Id.*; *see also Summerlin v. Schriro*, 427 F.3d 623, 641 (9th Cir. 2005) (en banc) (noting that "instantaneous premeditation" is "not definitive for the purpose of establishing the especially heinous, cruel, or depraved aggravator"). Although Pinholster's crime was surely vicious, the facts of the crime were unfortunately far from extreme in either their depravity or cruelty. *See, e.g.*, *Hovey v. Ayers*, 458 F.3d 892, 898 (9th Cir. 2006) (defendant abducted a young girl as she was walking home from school, sexually molested her and abandoned her on the side of the road with six skull fractures and 14 laceration wounds); *Fields v. Brown*, 431 F.3d 1186, 1202 (9th Cir. 2005) (defendant was responsible for a " 'one-man crime wave' " during which he committed "a murder and at least three kidnapings, rapes, and robberies within a three-week period of time").

Second, the aggravating evidence introduced against Pinholster that pertained to incidents *other* than the murders themselves was also less severe than that in many of our previous cases. As the majority notes, Pinholster denied murdering Johnson and Beckett, referred to himself as a "professional robber," testified that he often scratched people's property, was convicted of kidnaping and received several disciplinary infractions while arrested and incarcerated. *See* Maj. Op. at 4774-77 & n.29. As presented to the jury, however, Pinholster's criminal record was not very extensive, as it did not include any convictions other than the kidnaping count. Moreover, although the majority believes this aggravating evidence was of overwhelming importance, the prosecutor did not actually refer to Pinholster's denial of his involvement in the murders, his prior robberies or his penchant for scratching property at any point during the penalty phase. Considering analogous aggravating evidence in *Belmontes*, we concluded that it was "not strong," but was "minimal" and "weak[ ]." 414 F.3d at 1106, 1139-40. The relevant facts in that case consisted of Belmontes' "previous[ ] incarc-

erat[ation] in the youth facility for being an accessory after the fact to voluntary manslaughter, one domestic violence incident, and two occurrences relating to possession, or possible possession, of a gun." *Id.* at 1139. Similarly, we noted that the prosecution presented "considerable" aggravating evidence in *Boyde v. Brown*, 404 F.3d 1159, 1179 (9th Cir. 2005). The incidents introduced in that case included the petitioner's assaults on former classmates, his throwing bricks at a van, his theft of his stepfather's gun, his prior robberies, his drug use while incarcerated and his plot to escape from prison. *See id.*

The majority dismisses the relevance of any comparisons between Pinholster's murders and other crimes, noting that under California law, the jury reviews only the facts in front of it and does not conduct a proportionality review by comparing the crime to others. *See* Maj. Op. at 4775-76 n.30. All jurors, however, consider a case against a background of social understandings and shared experiences about crime and criminals, which in turn influences their decision as to whether someone has committed an offense so heinous as to warrant the ultimate penalty. Indeed, the majority's emphasis on the lack of proportionality analysis in California law underscores the prejudice that resulted from counsels' failure to put forth the reams of the readily available mitigating evidence in Pinholster's case. Because the jurors could weigh *only* the aggravating and mitigating evidence presented to them, the omissions of and outright misrepresentations about mitigating evidence on Pinholster's side of the scale plainly left the jury with little to tip the balance toward life imprisonment over execution.

Finally, as discussed above, some of the aggravating evidence that the majority cites would never have been introduced had Pinholster's counsel not performed deficiently during the guilt phase of the trial. In particular, Pinholster's references to his own past robberies — probably the most damning testimony the jury heard, next to the details of the

actual murders — and his statements about the swastikas and signatures he frequently scratched into other people's property would never have been admitted. *See* Maj. Op. at 4776-77. Competent representation during the trial's first stage would thus have further weakened the prosecution's argument during the penalty phase that Pinholster deserved the ultimate penalty.

**3.**

The mitigating evidence that Pinholster could have introduced was therefore substantially more compelling than the majority acknowledges, whereas the aggravating evidence was somewhat weaker. If the evidence on both sides of the ledger is fairly characterized, and evaluated in light of the Supreme Court's recent decisions in *Williams*, *Wiggins* and *Rompilla*, it is clear that the California Supreme Court's denial of Pinholster's penalty phase IAC claim was objectively unreasonable.

The available mitigating evidence in *Williams* was that the petitioner had been beaten by his father, that his parents had been imprisoned for criminal neglect, that he had been placed under the custody of the social services bureau for two years, that he was borderline mentally retarded, that he had helped crack a prison drug ring and that he had been a peaceful prisoner. *See* 529 U.S. at 395-96. The aggravating evidence, on the other hand, was that the petitioner had been convicted of armed robbery, burglary and grand larceny prior to the murder for which he was sentenced to death, and that after the murder he perpetrated two auto thefts and two separate assaults on elderly victims. The jury also learned that he was convicted for setting a fire while in jail. *See id.* at 368-69. In *Wiggins*, the available mitigating evidence was that the petitioner experienced severe privation and abuse while in his mother's custody, that he was abused, sexually molested and raped while in foster care, that he was homeless for a period and that his mental capacity was diminished. *See* 539 U.S. at 535. The

only aggravating evidence was that the petitioner had drowned his elderly victim and ransacked her apartment; he had no record of violent conduct before or after the murder. *See id.* at 514, 537. Finally, the available mitigating evidence in *Rompilla* was that the petitioner grew up in a slum, that he was abused by his father, that his parents were alcoholics, that he consumed too much alcohol, that he was mentally retarded and that he suffered from organic brain damage. *See* 545 U.S. at 390-93. The aggravating evidence consisted of the petitioner's prior convictions for rape, burglary and theft, as well as his use of torture in committing the murder for which he was sentenced to death. *See id.* at 378; *Rompilla v. Horn*, 355 F.3d 233, 237 (3d Cir. 2004), *overruled by* 545 U.S. 374 (2005).

Although the majority asserts that Pinholster's available mitigating evidence "falls short when compared to the mitigating evidence available in *Williams*, *Wiggins*, and *Rompilla*," that evidence cannot be meaningfully distinguished from these cases. Maj. Op. at 4773. Pinholster, Williams, Wiggins and Rompilla were all badly beaten by their parents. All four men grew up in extreme poverty with little to no parental attention. All four spent time in foster homes and other institutional settings as children. Pinholster and Rompilla suffered from organic brain damage, while Williams and Wiggins were mentally retarded or close to it. And both Pinholster and Rompilla were addicted to alcohol.

Rather than heed these obvious similarities, the majority emphasizes the differences that inevitably exist between one person's life and another's. For instance, Williams, unlike Pinholster, behaved well while in prison and Wiggins, also unlike Pinholster, was sexually molested and spent time homeless. Maj. Op. at 4773. These minor factual contrasts cannot be legally dispositive, particularly given that several aspects of Pinholster's available mitigating evidence have no parallel in *Williams*, *Wiggins* and *Rompilla*. Pinholster's mother, for example, did not just neglect him but rather actively encouraged his illegal activities. His siblings had

serious problems with alcohol, drugs, mental health and the law. Pinholster himself is a lifelong epileptic prone to severe seizures. He was socially isolated and maladjusted as a child. His substance abuse issues began at an early age and involved an array of illegal drugs. And Pinholster's counsel did not just present incomplete information about him in mitigation, but rather allowed his mother to give inaccurate testimony that was then used against him by the prosecution. I do not necessarily contend that these differences make Pinholster's available mitigating evidence *more* powerful than that in *Williams*, *Wiggins* and *Rompilla*. They do, however, more than offset the supposedly meaningful contrasts that the majority identifies.

On the aggravating evidence side, I agree with the majority that *Wiggins* can be distinguished because the petitioner in that case, unlike Pinholster, "[did] not have a record of violent conduct that could have been introduced by the State to offset th[e] powerful mitigating narrative." 539 U.S. at 537; *see* Maj. Op. at 4773-74. However, the aggravating evidence against Pinholster was not dispositively stronger than that in *Williams* and *Rompilla*. It is true, as the majority asserts, that Pinholster admitted to committing many past robberies — in guilt phase testimony that would never have taken place had he been competently represented, and that the prosecutor never mentioned during the penalty phase — and that he was an unusually problematic inmate. *See* Maj. Op. at 4774-76 & n.29. But Williams also committed theft-related offenses both before and after his homicide, and, unlike Pinholster, he was actually *convicted* of some of those crimes (namely his 1976 armed robbery and his 1982 burglary and grand larceny). There is also no analogue in Pinholster's criminal history to Williams' "two separate violent assaults on elderly victims perpetrated after the [relevant] murder," his proclivity for starting fires or the testimony by two expert witnesses that he would "pose a serious continuing threat to society." 529 U.S. at 368-69. Rompilla, similarly, was actually convicted of burglary and theft. He was also convicted of rape — a more seri-

ous crime than any Pinholster committed before the instant murders — and tortured his homicide victim before finally putting him out of his misery. *See* 545 U.S. at 378; 355 F.3d at 237. Again, I do not necessarily argue that these differences make the aggravating evidence against Pinholster *weaker* than that in *Williams* and *Rompilla*. But I cannot accept the majority's conclusion that the aggravating evidence against Pinholster was dispositively worse.

Though the majority does not address them, it is also clear that none of the Supreme Court decisions that have upheld state court denials of petitioners' penalty phase IAC claims are as relevant here as *Williams*, *Wiggins* and *Rompilla*. In *Strickland*, "[t]he evidence that respondent says his trial counsel should have offered at the sentencing hearing would barely have altered the sentencing profile presented to the sentencing judge," and the aggravating factors were "overwhelming." 466 U.S. at 699-700. The balance between available mitigating evidence and aggravating evidence was thus starkly different from *Williams*, *Wiggins*, *Rompilla* and the case before us. In *Burger v. Kemp*, 483 U.S. 776 (1987), and *Bell v. Cone*, 535 U.S. 685 (2002), the Court never reached the prejudice prong of the IAC inquiry because it concluded that the petitioners' lawyers had not performed deficiently. The aggravating evidence in *Burger* and *Bell* was also more severe than in this case, while the available mitigating evidence was less powerful. *See Bell*, 535 U.S. at 699; *Burger*, 483 U.S. at 789-94. *Woodford v. Visciotti*, 537 U.S. 19 (2002), is inapposite for the same reason: The aggravating evidence, which included the knifing of one man and the stabbing of a pregnant woman, was "devastating" while the available mitigating evidence was not particularly potent. *Id.* at 26. *Schriro v. Landrigan*, 127 S. Ct. 1933 (2007), finally, dealt primarily with the extraneous issue of a petitioner instructing his lawyer not to mount a case in mitigation. The Court also explicitly labeled the available mitigating evidence in that case as "weak," and noted the petitioner's "exceedingly violent past" of murders, kidnapings and prison escapes. *Id.* at

1944. Accordingly, nothing in the Supreme Court's other penalty phase IAC decisions undermines my conclusion that we are bound here by *Williams*, *Wiggins* and *Rompilla* — and that those cases require us to hold that the California Supreme Court's denial of Pinholster's penalty phase IAC claim was objectively unreasonable.

## III.

The California Supreme Court's summary denial of Pinholster's penalty phase IAC claim was an objectively unreasonable application of *Strickland*. The performance of Pinholster's counsel at the penalty phase was plainly deficient; and the available mitigating evidence in his favor and the aggravating evidence against him — when they are fairly characterized — render this case materially indistinguishable for purposes of prejudice from *Williams* and *Rompilla*. I therefore dissent. I would remand for the district court to issue a writ vacating Pinholster's sentence, unless within a reasonable time set by the court the State conducts a new penalty phase trial or imposes a lesser sentence consistent with law.